In re Joseph MUTO, Sheryl Muto, Debtors.

Joseph MUTO, Sheryl Muto, Plaintiffs,

v.

Sallie MAE, UNIPAC Service Corp., Great Lakes Higher Education Services, New York State Education Services Corporation, Defendants.

Bankruptcy No. 94–62735.
Adversary No. 94–70184.

United States Bankruptcy Court, N.D. New York.

Feb. 13, 1996.

Mackenzie, Smith, Lewis, Michell & Hughes, LLP, Syracuse, NY (Kevin J. O'Brien, of Counsel), for Plaintiffs.

New York State Higher Education Services Corporation, Albany, NY (Margaret M. Gonsowski, of Counsel), for Defendants.

Dew & Blaney, Madison, WI (Lloyd J. Blaney, of Counsel), for Great Lakes Higher Education Services.

## MEMORANDUM-DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Before the Court is an adversary proceeding commenced on December 9, 1994, by Joseph Muto ("J. Muto") and Sheryl Muto ("S. Muto") (collectively "Debtors") against

Sallie Mae–VA ("Sallie Mae"), UNIPAC Service Corporation ("UNIPAC"), Great Lakes Higher Education Services ("Great Lakes") and New York State Higher Education Services Corporation ("NYSHESC") (collectively "Defendants") seeking a discharge of student loans of both Debtors pursuant to § 523(a)(8) of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code").

Issue was joined on January 9, 1995, by service of an answer on behalf of NYSHESC, by service of an answer on behalf of Great Lakes on January 12, 1995, and by service of an answer on behalf of Sallie Mae on February 7, 1995.

A trial was held at Utica, New York, on October 2, 1995.[1] Following the trial, the Court reserved its decision and in lieu of closing arguments allowed the parties to submit memoranda of law on or before November 6, 1995.

### JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(I).

### FACTS

The Debtors filed a joint voluntary petition ("Petition") seeking relief pursuant to Chapter 7 of the Code on October 6, 1994. On January 31, 1995 at the time of J. Muto's response to the interrogatories of Great Lakes, he was 40 years old and S. Muto was 37 years old (*see* Defendants' Exhibit C, Response to Question # 1). The couple had been married on August 15, 1979 (*see* Defendants' Exhibit A, Response to Question # 7(b)) and have four children ranging in age from 2 to 15 years old. All members of the Debtors' household are apparently in good physical health.

### Educational, Employment and Student Loan History

#### A. Sheryl Muto

S. Muto attended LeMoyne College, Syracuse, New York, for two years and attended the State University of New York at Oswego for three semesters. She graduated from Crouse Irving Memorial Hospital School of Nursing and Onondaga Community College, both located in Syracuse, New York, receiving an Associate's degree in nursing in 1988. Following her graduation, she was employed as a nurse at Community General Hospital in Syracuse from October 1988 to December 1988. Beginning in January 1989, she worked as a staff nurse at Crouse Irving Memorial Hospital ("Crouse Irving"). At the time that the Debtors filed their Petition, S. Muto was earning approximately $26,000 per year at Crouse Irving, exclusive of overtime pay which she estimated to be approximately $6,000 to $8,000 per year. According to Schedule I of the Debtors' Petition, after deductions for taxes, parking, child care and medical coverage, S. Muto's net monthly earnings totalled $923.18 per month.

On March 3, 1995, she was hired as a Health Care Examiner for Empire Medicare Services, earning an annual salary of $26,000 (*see* Defendants' Exhibit H). S. Muto testified that she continues to work for Crouse Irving on a *per diem* basis, earning approximately $331.37 per month. It was her testimony that since she was not required to work any overtime in the new position, she was able to spend more time with her children, who had been experiencing difficulties in school, and had also been able to reduce her child care expenses. She estimated her total net income from the two jobs to be approximately $1,588.21 per month (*see* Debtors' Exhibit 10).

---

1. At the trial, Lloyd J. Blaney, Esq. appeared on behalf of Great Lakes and Margaret M. Gonsowski, Esq. appeared on behalf of NYSHESC. UNIPAC did not file an answer and was not represented at the trial. Sallie Mae, in its answer, asserted that J. Muto's loan account was at one time owned by Sallie Mae and serviced by UNIPAC. However, upon J. Muto's default on the loan, a claim was filed with the loan's guarantor, Great Lakes, and the account was paid off by Great Lakes. An Order was signed by this Court on May 16, 1995, discontinuing the adversary proceeding as to Sallie Mae. A similar Order was also signed by the Court on April 10, 1995, discontinuing the adversary proceeding as between J. Muto and NYSHESC. At the conclusion of the trial, Debtors' counsel acknowledged to the Court that the adversary proceeding had also been discontinued as to UNIPAC.

S. Muto testified that she had received three separate loans to finance her education, and on or about July 7, 1992, she consolidated the various loans which at that time totalled $15,500.32. She received a deferment from September 9, 1992 to February 26, 1993, and then began making payments to Sallie Mae in March, 1993, as follows:

| Date | Amount |
| --- | --- |
| 3/11/93 | $ 116.98 |
| 4/6/93 | 121.37 |
| 7/7/93 | 242.74 |
| 8/30/93 | 121.37 |
| 10/12/93 | 121.37 |
| 10/28/93 | 121.37 |
| 11/15/93 | 121.37 |
| 3/16/94 | 121.37 |
| 3/16/94 | 121.37 |
| 4/19/94 | 121.37 |
| 4/19/94 | 121.37 |
| 7/26/94 | 485.48 |
| | 1,937.53 [2] |

It was S. Muto's testimony that she did not make any payments on her student loans after July 26, 1994, because of the loss of permanent employment by her husband and the resultant inability of the Debtors to meet even their day-to-day household expenses. S. Muto testified that she had not filed for any deferment when she found herself unable to make the monthly payments and decided to seek bankruptcy relief in October 1994. On February 26, 1995, her loans, then totalling $17,228.37, were purchased by NYSH-ESC.

## B. *Joseph Muto*

J. Muto received a B.A. degree in history and accounting in 1977 from LeMoyne College. In February 1982, he enrolled in the Masters of Business Administration ("MBA") program of the New York Institute of Technology while an employee of Carrier Corporation. He obtained an MBA degree with distinction in June 1989, with a concentration in finance. In the interim, he also had enrolled in the University of Bridgeport School of Law, Bridgeport, Connecticut, in January 1984, receiving his Juris Doctor degree *cum laude* in May 1986.

From September or October 1986 through November 1989, he was employed as an attorney working for a number of different entities including not only two law firms in Syracuse, but also the Cortland County District Attorney's Office and the Rensselaer County District Attorney's Office, as well as Hyatt Legal Services and Legal Aid of Buffalo. He entered private practice sometime after November 1989, only to lose his license to practice in October 1990. Upon his reinstatement in October 1991, he again entered into private practice for approximately two years. In October 1993, he accepted a position as a stock broker trainee for a period of approximately three months and then returned to private practice. He was again suspended from the practice of law on December 23, 1994, by the Fourth Department of the Appellate Division of the New York State Supreme Court. At the trial he testified that he was scheduled to attend a hearing on October 24, 1995, at which time he could seek reinstatement from the Grievance Committee for the Fifth Judicial District of New York State. However, he was not optimistic about his chances of reinstatement.

According to Schedule I, J. Muto was self-employed as an attorney in October 1994 when Debtors' Petition was filed. At that time, he estimated his monthly gross income to be $830 and after deductions, he estimated his monthly take home pay to be $664 per month. Following his suspension in December 1994, he was able to obtain various nonlegal temporary positions. On direct examination, he testified that he had recently been hired by Blue Cross & Blue Shield as a microfilm clerk in its Claims Administration Division at an annual salary of $13,600. He estimated that his net income from the new position would amount to $200 per week or approximately $869 per month. When combined with his wife's monthly net income of $1,588.21, total net income for both Debtors was estimated to be $2,457.21. In the Petition, the Debtors had listed $2,340.95 per month in expenses. However, according to the Statements of Income and Expenses admitted into evidence at the trial, their ex-

---

**2.** According to the Partial Stipulation of Facts between S. Muto and NYSHESC ("NYSHESC Stipulation"), filed September 25, 1995, pay-

ments totalled $1,914.58. However, the payments listed in the NYSHESC Stipulation actually add up to $1,937.53.

penses now total $2,114.45 per month. *See* Debtors' Exhibits 11 and 12.

On cross-examination, J. Muto testified that he considered himself qualified to be a budget analyst or a financial analyst. However, he felt his opportunities for employment in that field were limited in the Syracuse community because of his poor professional reputation as an attorney. He explained that he had been born and raised in Syracuse and would prefer to remain there. It was his testimony that he had talked to a couple of brokerage firms in Hartford, Connecticut, and had also perused the Denver and Philadelphia newspapers for financial positions. He testified that as he now had a secure position with Blue Cross & Blue Shield with the potential for promotion, he would be very hesitant to relocate, stating facetiously that he would, however, consider an offer of a position outside the Syracuse area if it included an annual salary of $100,000 and the guarantee of continued employment for five years.

In connection with his education, J. Muto received a consolidation loan of $41,396.99 from Great Lake's assignor, Sallie Mae, on or about October 5, 1987.[3] As of December 7, 1994, when Great Lakes purchased his loan, there was $57,902.74 owing. J. Muto testified that he had never made any payments on any of his student loans and had defaulted on them in the fall of 1994. As of February 1, 1995, the total amount owed to Great Lakes was $57,915.96.

## DISCUSSION

Within the Second Circuit, the dischargeability of a debt for a student loan pursuant to Code § 523(a)(8)(B) is to be determined applying the three prong test announced by the Court of Appeals in *Brunner v. New York State Higher Educ. Services Corp.,* 831 F.2d 395, 396 (2d Cir.1987).[4] *Accord Pennsylvania Higher Educ. Assistance Agency v. Cunningham,* No. 94–CV–1573 (N.D.N.Y. Oct. 31, 1995) (McAvoy, C.J.)

The *Brunner* test provides that a debtor seeking a Code § 523(a)(8)(B) hardship discharge must prove (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself/herself and his/her dependents if forced to repay the loans; (2) that additional circumstances exist indicating this state of affairs is likely to persist for a significant portion of the repayment period of the student loans, and (3) that the debtor has made good faith efforts to repay the loans. *Brunner, supra,* 831 F.2d at 396. The Debtors have the burden of establishing each of the three elements. *Faish,* 72 F.3d at 305–06; *In re Healey,* 161 B.R. 389, 393–394 (E.D.Mich.1993) (citations omitted).

The first prong of the *Brunner* test requires the Court to examine whether the Debtors have demonstrated that they are unable to earn sufficient income to maintain themselves and their dependents *and* repay the educational debt. *See Roberson, supra,* 999 F.2d at 1135 (citing Comm'n on the Bankruptcy Laws of the United States, Report, H.R.Doc. No. 137, 93d Cong., 1st Sess., Pt. II, at 140 n. 15 (1973)). Implicit in the Court's analysis is a determination whether the Debtors have demonstrated that they

---

**3.** Code § 523(a)(8)(A) allows a debtor to discharge a debt for a student loan which "became due more than seven years (exclusive of any applicable suspension of the repayment period)" before the commencement of the bankruptcy case. The Debtors filed their Petition on October 6, 1994, which is more than seven years after the consolidation of J. Muto's loan. However, as Debtors acknowledge in their Memorandum of Law, filed on November 1, 1995, J. Muto is not entitled to a discharge of his debt pursuant to Code § 523(a)(8)(A) as the courts have interpreted "applicable suspension" to include any periods of deferment granted the debtor at his/her request. *See e.g. In re Huber,* 169 B.R. 82 (Bankr.W.D.N.Y.1994); *In re Georgina,* 124 B.R.

562 (Bankr.W.D.Mo.1991); *In re Gremler,* 127 B.R. 202 (Bankr.E.D.Wis.1991). In this case, J. Muto testified that he had applied for and was granted numerous deferments subsequent to the consolidation of his loans in 1987.

**4.** The *Brunner* "undue hardship" test has been accepted by other circuits as well. *See e.g. Pennsylvania Higher Education Assistance Agency v. Faish (In re Faish),* 72 F.3d 298 (3d Cir.); *In re Roberson,* 999 F.2d 1132 (7th Cir.1993); *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman),* 25 F.3d 356 (6th Cir.1994) *cert. denied,* 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995).

have minimized their living expenses while maximizing their personal and professional resources. *Healey, supra,* 161 B.R. at 394, citing *In re Evans,* 131 B.R. 372, 375 (Bankr. S.D.Ohio 1991).

There is a question whether *both* Debtors have maximized their personal and professional resources. S. Muto is working full-time for Empire Medicare Services as a Health Care Examiner, supplementing her income by working on a per diem basis for Crouse Irving as a nurse. J. Muto, on the other hand, is working as a microfilm clerk, a job for which he admits he is overqualified. He holds an MBA degree in finance and also has his brokerage license. Yet, he testified that he was reluctant to seek employment outside of the Syracuse area for a more lucrative position for which he is qualified. He appears to be content with what he perceived as a secure position with the potential for advancement. The Court certainly is not in a position to require J. Muto to seek alternative employment. However, while the Court finds that S. Muto has maximized both her personal and professional resources in working two jobs, both of which require that she be a registered nurse, the Court would commit reversible error if it were to conclude that J. Muto's efforts maximized either his personal or professional resources.

At the time of the trial, both Debtors were employed, and their aggregate net income was $2,457.21 per month. At the trial S. Muto testified that she hoped to become current on their obligations now that her husband was working full-time. Their expenses had been reduced from the date they filed their Petition to $2,114.45 per month (*see* Debtors' Exhibits 11 and 12), leaving a balance of $342.76 per month with which to repay their student loans. S. Muto's prior monthly payments were $121.37, leaving $211.39 per month available to repay J. Muto's loan obligation to Great Lakes. Although the Court was not presented with any evidence of what the amount of the monthly payments to Great Lakes are, it is reasonable to assume, after comparing the total amount owed on each of the Debtors' loans, that J. Muto's monthly payment to Great Lakes is likely to be in excess of $211.39.

Overall, the Court finds that every effort has been made to minimize the expenses of the Debtors' family of six. The Debtors have demonstrated that they are currently unable to earn sufficient income to maintain themselves and their dependents *and* repay *both* of their educational debts. They are, however, in the view of this Court, in a position to repay a portion of their educational debts without the imposition of undue hardship at this time.

The second prong of the *Brunner* test requires that the Debtors establish more than a present inability to fulfill their student loan obligations. *See In re Cahill,* 93 B.R. 8, 13 (Bankr.N.D.N.Y.1988) (citation omitted). They must demonstrate to the Court that their current financial hardship is likely to be long-term. *Id.; see also Brunner, supra,* 831 F.2d at 396 (Evidence must establish "exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time ...."); *In re Garrett,* 180 B.R. 358, 363 (Bankr.D.N.H.1995) (citations omitted) ("[I]nability to pay which can constitute undue hardship must be long-term and not simply a temporary loss of income.").

In making student loans available to the Debtors, the Defendants did not offer a guarantee to the Debtors of their future financial success. From the record, it is clear that S. Muto has been able to take advantage of the education she received to pursue a chosen career in nursing. There is nothing in the record to indicate that she suffers from ill health or other disability that would preclude her from obtaining continued employment using her skills and experience as a nurse.

On the other hand, J. Muto, for a variety of reasons, has been unable to pursue the legal career he had hoped to when he obtained his law degree in 1986 and has likewise been unable to utilize his MBA degree either. He did not provide any evidence that there were no better paying positions available for which he was qualified and had sought employment. He testified that he was qualified as a budget or financial analyst and also held a brokerage license. He stated that he had contacted a couple of brokerage firms in Hartford, Connecticut, and had looked over the Denver and Philadelphia

newspapers for possible positions in the field of finance. However, he testified that he would prefer to remain in Syracuse where he was born and raised. To this end, he has recently accepted a full-time position as a microfilm clerk with Blue Cross & Blue Shield. While acknowledging that he was overqualified for the position, it was his testimony that he considered his new position secure and one which would provide him with numerous opportunities for advancement.

In a previous case, this Court denied the discharge of a debtor in similar circumstances on the basis that she had "made no cognizable effort to find better paying employment in her career field [graphic arts], albeit outside the Cortland/Ithaca, New York area, that would demonstrate to this Court that her employment opportunities are, indeed, limited and that her current financial situation is likely to continue, making repayment difficult." *See Kielar v. Rochester Institute of Technology (In re Kielar),* Case No. 93–61343, Adv. Pro. 93–70106 (Bankr. N.D.N.Y. March 4, 1994). In this case, J. Muto, while claiming to have boxes full of rejection letters, has failed to provide the Court with any concrete evidence of his efforts to obtain employment commensurate with his apparent intellectual abilities and educational background either in Syracuse or other areas of the country.

Although there was evidence that J. Muto suffers from an emotional disorder which occasionally necessitates counseling (*see* Defendants' Exhibit C, J. Muto's Response to Question # 11), he apparently is in good physical health, well-educated and articulate. While he may be unable to again pursue a legal career and is currently underemployed in a marginal job outside his chosen fields of study, there is no evidence that he would be unable to obtain the type of employment for which he is qualified over the long-term either in Syracuse or elsewhere which would ease some of the financial burden associated with the repayment of his student loans. J. Muto was also optimistic about his opportunities for advancement in his current position.

Whether J. Muto remains working for his current employer or obtains more lucrative employment elsewhere, S. Muto's training and experience as a nurse should not preclude the Debtors from relocating. There also was no testimony that Debtors' children have any special needs that would prevent the relocation of Debtors' family. Therefore, while the Debtors have experienced some difficulty in repaying their student loans in the past due in large part to J. Muto's sporadic employment history as an attorney, the Debtors have failed to convince the Court that their past financial problems are likely to continue over an extended period of time.

As the Debtors have failed to carry their burden with respect to either of the first two prongs of the *Brunner* test, it is unnecessary for the Court to address the third prong, namely whether both Debtors made a good faith effort to repay their loans.[5]

Having concluded that the Debtors have failed to establish undue hardship which would warrant the discharge of their debts to the Defendants, the Court must dismiss the Debtors' complaint as to both remaining Defendants. At the same time, the Court has discretion to consider the extent to which the debts are determined to be nondischargeable (*see In re Woyame,* 161 B.R. 198, 203 (Bankr. N.D.Ohio 1993)); *In re Fox,* 189 B.R. 115, 120 (Bankr.N.D.Ohio 1995) or, in the alternative, to order a deferment based on the Debtors' current situation (*see In re Sands,* 166 B.R. 299, 313 (Bankr.W.D.Mich.1994)). Indeed, counsel for Great Lakes has expressed a willingness to reduce the amount of its debt deemed nondischargeable on the basis that "nondischarge of the entire amount may work an undue hardship on Debtors' dependents." *See* Great Lake's Memorandum of Law, filed October 23, 1995, p. 5.

Deferment does not appear necessary or appropriate at this juncture since it has been determined that the Debtors have approximately $342 available on a monthly basis to make payments to the Defendants. Instead, the Court deems it appropriate to reduce the debt owed to Great Lakes from approximate-

---

**5.** Any analysis is this regard is made difficult by the fact that although neither of the Debtors sought a deferment of their student loan obligations prepetition, at least S. Muto had made a number of payments on her loan; whereas, J. Muto admitted he had made none whatsoever.

ly $57,915.96 to $42,000, and the debt owed to NYSHESC from approximately $17,228.37 to $12,000. Great Lakes shall be paid $200 per month and NYSHESC $100 per month beginning March 1, 1996, over a period of 120 months (10 years), at which time NYSHESC shall have been paid in full. Thereafter, payments of $300 per month for an additional 60 months (5 years) shall be made to Great Lakes. No interest shall accrue on either debt unless either Great Lakes or NYSHESC do not receive the above-scheduled payments within fifteen (15) days of the due date, thereby resulting in default, in which instance interest shall accrue at the rate of nine percent (9%) per annum on the unpaid balance until the missing payment or payments are brought current.

Based on the foregoing, it is

ORDERED that the relief sought in the Complaint herein as against NYSHESC is denied to the extent of $12,000, which amount is deemed to be nondischargeable as to S. Muto; it is further

ORDERED that the relief sought in the Complaint herein as against Great Lakes is denied to the extent of $42,000, which amount is deemed to be nondischargeable as to J. Muto; and it is further

ORDERED that repayment of the student loans shall consist of monthly payments of $300 over a period of 180 months, commencing March 1, 1996. The payments shall be made to the respective student loan creditors as follows: $100 per month to NYSHESC, beginning March 1, 1996, for a period of 120 months (ten years), and $200 per month to Great Lakes, beginning March 1, 1996, for the same period of 120 months (ten years), at which time the payments to Great Lakes shall be increased to $300 per month for 60 months (five years) thereafter.