**In re Daniel & Suzanne LEBOVITS, Debtors.**

**Daniel LEBOVITS, Plaintiff,**

**v.**

**CHASE MANHATTAN BANK, Sallie Mae Servicing Center, and United Student Aid Funds, Defendants.**

Bankruptcy No. 897–82135–478.
Adversary No. 97–8457–478.

United States Bankruptcy Court,
E.D. New York.

Aug. 5, 1998.

Tracy L. Klestadt & Associates by Tracy L. Klestadt, New York City, for plaintiff/debtor.

Neiman Ginsberg & Mairanz, P.C. by Gary Ginsberg, New York City, for defendants.

## DECISION DISCHARGING STUDENT LOANS AS UNDUE HARDSHIP

DOROTHY EISENBERG, Bankruptcy Judge.

The Chapter 7 debtor, Daniel Lebovits (the "Debtor"), filed this adversary proceeding in order to have his student loan indebtedness (the "Student Loans") declared dischargeable pursuant to 11 U.S.C. § 523(a)(8)(B), claiming that it would impose an "undue hardship" on the Debtor and his dependents if the debt is not discharged. This case was tried before the Court on March 3, 1998. This decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(c), as made applicable herein by Fed.R.Bankr.P. 7052. The Court has jurisdiction of this core proceeding pursuant to 28 U.S.C. Sections 1334(b) and 157(b)(2)(I) and the Order of Reference of the United States District Court for the Eastern District of New York dated August 28, 1986.

### FACTS

The following are the Court's findings of fact:

1. On March 27, 1997, the Debtor filed jointly with his spouse, Suzanne Lebovits, a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

2. On July 29, 1997, the Debtor and his wife received a Chapter 7 discharge.

3. Before filing for bankruptcy, the Debtor sought consumer credit counseling and was advised that there was no recourse but to declare bankruptcy (Trial Tr., p. 26).

4. On August 19, 1997, Chase Manhattan Bank, Sallie Mae Servicing Corporation ("Sallie Mae") and USA Funds were each served with a copy of a summons and complaint (the "Complaint") in this adversary proceeding to determine the dischargeablility of the Debtor's Student Loans.

5. The Debtor received a Masters Degree in Social Work from Yeshiva University in July of 1995.

6. During the years 1993 through 1995, the Debtor borrowed the total sum of $54,000 in Student Loans in order to finance his

graduate schooling. The Debtor's Student Loans were originally provided by Chemical Bank (which subsequently merged with Chase Manhattan Bank ("Chase")) under the auspices of the Federal Family Education Loan Program ("FFELP"). On or about May 16, 1996, the Debtor's Student Loans were consolidated at an annual interest rate of nine (9%) percent for a term of ten (10) years.

7. At the time of service of the Complaint, USA Funds was the guarantor of the Student Loans. Subsequently, on or about August 22, 1997, Chase assigned all right, title and interest in the Student Loans to USA Funds.

8. The total amount outstanding on the Student Loans, as of September 26, 1997, was $49,040.12, with interest continuing to accumulate at a per diem rate of $12.07.

9. Since the consolidation of the Student Loans in May of 1996, the Debtor has paid $792.76 in principal and $1,129.38 in interest. There are 9.3 years remaining on the Student Loans.

10. The Debtor did not seek a deferment on the Student Loans because he believes that his financial position will be worse in the future than it is at the present time.

11. On or about September 19, 1997, USA Funds paid Chase the full amount outstanding on the Student Loans.

12. Default judgment has been entered against both Chase and Sallie Mae in this adversary proceeding. Accordingly, USA Funds (sometimes referred to as the "Defendant") is the only remaining defendant herein.

13. The Debtor is 40 years old and married to the co-debtor. They have seven (7) dependent children, ranging in age from fifteen (15) months to eleven (11) years, all of whom live at home with the Debtor and his wife.

14. The Debtor is currently employed as a social worker by the Parker Geriatric Institute, where he has worked for approximately one (1) year. His yearly salary is approximately $45,000.[1] The Debtor receives a gross salary of $3,738.46 per month. His net take home pay is $2,973.91 per month.

15. Mrs. Lebovits is currently employed as a part-time secretary at Interborough Clinic, where she has been employed for approximately one and one-half (1 1/2) years. She receives a gross salary of $1,000 per month, and her net take home pay is $909.20 per month.[2]

16. The only other source of income for the Debtor and his wife is derived from the rental of a portion of their one-family home to a relative for a monthly rental of $800.00.

17. The total monthly net income of the Debtor and his wife from all sources is currently $4,683.11. The current combined monthly expenses of the Debtor and his wife total $6,341.00,[3] inclusive of a monthly payment of $375.00 for the Student Loans. If

1. Prior to trial, the parties stipulated to the fact that the Debtor's annual salary is $45,000. However, the Debtor testified at trial that he recently received a three (3%) percent cost-of-living adjustment and that, therefore, his salary is slightly more than $45,000 per year.

2. At the time of the filing of the bankruptcy petition, Mrs. Lebovits earned a monthly gross salary of $2,000 and a monthly net salary of $1,818.40 at her part-time job. The Defendant states that after the Debtor obtained his current employment, Mrs. Lebovits' salary decreased "by almost the exact amount of the Debtor's increase in salary, so that their combined total stated net income appears to have remained stagnant, despite the Debtor's raise." (Deft's Corrected Post-Trial Memo of Law, p. 7). Although the Defendant alleges that the "Debtor and his wife played with their income to have a better chance at success in this proceeding" (Deft's Corrected Post-Trial Memo of Law, p. 7), this Court disagrees. An equally plausible explanation is that Mrs. Lebovits' employment outside the home is not cost-effective. Given that she is the primary care giver with respect to seven young children, even if she works more hours, her disposable income will not necessarily increase because the longer her work day, the greater are her daycare and/or babysitting expenses.

3. Although the parties stipulated prior to trial that the combined monthly expenses of the Debtor and his wife total $6,641.00, the Debtor testified at trial that parochial school tuition is $700 per month rather than $1,000 per month, as set forth in Schedule J. Accordingly, the Court agrees with the Defendant that the Pre-Trial Order should be modified to reflect the family's actual lower monthly expenditures.

this monthly expense was not included, their current monthly expenses would be $5,966.00. The Debtor's monthly expenditures are attributable to mortgage payments, utilities (including heating, electricity and telephone), food, clothing, laundry and dry cleaning, transportation, insurance premiums (including term life, automobile, and homeowner's), private school tuition, day care, and recreation. Although the Debtor's employer provides health insurance coverage, prescription drugs, eyeglasses and braces for the children's teeth are not included. The Court notes that there is no provision for the expense of maintenance and repair of the Debtor's residence.

18. The lifestyle of the Debtor and his family is not extravagant. The family never goes to the movies and, while there are occasional trips to a pizzeria, the family never goes to dinner at a restaurant. Mrs. Lebovits' parents often contribute groceries to the household.

19. The Debtor's only significant asset is his interest, as a tenant by the entirety, in the family home, which has a value of approximately $160,000 and a mortgage of approximately $140,000. Since each of the codebtors is entitled to a $10,000 homestead exemption, there appears to be no equity in this real property which can be used to benefit the Debtor's creditors. To supplement his income, the Debtor rents a four-room apartment to Mrs. Lebovits' brother and his family. The Debtor and his family occupy seven rooms in the house, including three bedrooms on the attic floor, which accommodations are not luxury living space (Trial Tr., p. 37). The Debtor and his wife own two automobiles which are each more than eleven years old and have over 100,000 miles on their odometers.

20. The Court notes that the Debtor and his family embrace an orthodox religious faith. As participants in their orthodox religion, the Debtor and his spouse obey strict religious laws.

21. At trial, the Defendant demonstrated certain minor inaccuracies and misstatements in the Debtor's Schedules, including the itemized expenditures set forth in Schedule J, none of which was materially significant.

22. The Chapter 7 discharge did not reduce the Debtor's monthly expenditures.

23. The financial resources of the Debtor and his wife are not expected to materially increase within the foreseeable future for the following reasons:

(a) The Debtor is currently commanding the highest salary that he can expect to earn as a social worker within the foreseeable future without returning to school and incurring additional loans which he has no hope of repaying;

(b) At his current job, the Debtor has no expectations of pay raises other than cost-of-living adjustments of approximately three (3%) percent per year;

(c) The Debtor's current employment consists of approximately 37.5 hours a week and does not require evening hours. Although he previously saw private patients in the evening, the Debtor no longer does so; and

(d) Mrs. Lebovits is limited in the salary she can expect to command because she is primarily responsible for attending to the family's seven young children as well as the household chores.

24. The projected expenses of the Debtor and his wife are not expected to decrease within the foreseeable future, for the following reasons:

(a) According to the present ages of the Lebovits children, it is reasonable to infer that some, if not all, of them will be living at home for the next 10–15 years. Thus, the current expenditures attributable to the Debtor's children, including expenditures for food, clothing, tuition, medical/dental costs, and laundry, will likely extend for a significant portion of the repayment period of the Student Loans;

(b) To maintain even a minimal standard of living, the Debtor and his wife will continue to have the same, if not an increase in, expenditures attributable to food, clothing, medical/dental costs, laundry, insurance and transportation costs, during the repayment period of the Student Loans; and

(c) The Debtor will likely be required to incur expenditures in connection with re-

placement and/or repair of his automobiles during the repayment period of the Student Loans and, at a minimum, some expenditures for maintenance and upkeep of the family home.

25. The Court finds that repayment of the Student Loans would impose an undue hardship on the Debtor and his dependents if the Debtor were required to pay these loans within a reasonable period of time.

## DISCUSSION

As a matter of public policy, this Court believes that all student loans which are governmentally guaranteed or insured and made available to people who would otherwise not be financially capable of obtaining a higher or better education should be repaid. By virtue of the student loan program, millions of students were able to obtain a higher education and to earn significantly more over their lifetime than they would be able to earn without this education. Most of these people are repaying those loans, as they agreed to do. However, Congress has seen fit to make an exception to the rule that bankruptcy does not discharge a debtor's student loans when enforcing repayment would impose an undue hardship on the debtor and the debtor's dependents.

The Bankruptcy Code permits a debtor to discharge student loans under certain circumstances set forth in Section 523(a)(8)(B). That section states, in pertinent part, as follows:

(a) A discharge under section 727, 1141, 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for any obligation to repay funds received as an educational benefit, scholarship, or stipend unless—

(B) excepting such debt from the discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8)(B). The Bankruptcy Code does not define the phrase "undue hardship." *Brunner v. New York State Higher Educ. Services Corp.*, 46 B.R. 752, 753 (S.D.N.Y.1985), *aff'd*, 831 F.2d 395 (2d Cir.1987). Accordingly, it is within the discretion of the Court to decide whether the facts of a particular case, when considered in light of the circuit's applicable legal standard, warrant the granting of a hardship discharge under Section 523(a)(8)(B). Under the three prong test adopted by the Second Circuit in *Brunner*, 831 F.2d at 396, the Debtor will establish undue hardship only if he can demonstrate by a preponderance of the evidence that (1) the Debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the Student Loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the Student Loans; and (3) the Debtor has made good faith efforts to repay the loans. *Id.* Each part of the *Brunner* test for undue hardship discharge of student loans stands independently, and the Debtor bears the burden to prove each prong of the test. *In re Maulin*, 190 B.R. 153 (Bankr.W.D.N.Y.1995).

### (1) *The Debtor Cannot Maintain a Minimal Standard of Living For Himself and his Dependents*

To satisfy the first prong of the *Brunner* test, the Debtor must demonstrate that based on his current income and expenses, he cannot maintain a minimal standard of living if forced to repay the Student Loans. As stated above, the Debtor's total monthly household income is $4,683.11, and his monthly reasonable and necessary expenditures of the Debtor's household total $6,341.00, including the $375 per month attributable to repayment of the Student Loans. Thus, there is a monthly shortfall of $1,657.89. Even without the payment of $375 per month, the Debtor's reasonable expenses exceed his income at present, and the prospect for the foreseeable future does not appear to change this status. If the Debtor does increase his income by $1,000 per month, or $12,000 per year, it would not substantially improve his situation, but would

merely enable him to pay his bills without gratuitous contributions from family. Clearly, the Debtor cannot maintain a minimal standard of living for himself and his dependents if he is required to continue the monthly Student Loan payments.

■ The Defendant urges this Court to adopt the same definition of a minimal standard of living adopted in *In re Bryant*, 72 B.R. 913 (Bankr.E.D.Pa.1987). The *Bryant* Court used the 1986 Preliminary Estimate of Poverty Thresholds published by Census Bureau and the federal poverty guidelines published in the *Federal Register*, which guidelines are used as an eligibility criterion by a number of federal assistance programs, to establish whether the debtor had a minimal standard of living, i.e., "bare subsistence levels." *Bryant*, at 916. That Court proposed that a debtor whose income and resources were substantially over the federal poverty guidelines would be discharged from a governmentally-guaranteed or insured student loan only if the debtor could establish unique and extraordinary circumstances which would merit a discharge. *Bryant*, at 917 (e.g., expenses from a physical or mental illness or unusual responsibilities arising from the needs of any dependent) (Deft's Post–Trial Memo of Law, p. 5). The Defendant argues, based on the 1998 Poverty Guidelines issued by the Department of Health and Human Services ("HHS"),[4] that the Debtor's income level exceeds the poverty threshold for a family of nine and, therefore, is more than a minimal standard of living. This Court agrees with numerous other courts in declining to adopt the *Bryant* standard. *See, e.g., In re Faish*, 72 F.3d 298

(3d Cir.1995); *In re Shankwiler*, 208 B.R. 701 (Bankr.C.D.Cal.1997), *In re Hornsby*, 201 B.R. 195 (Bankr.W.D.Tenn.1995); *In re Mayes*, 183 B.R. 261 (Bankr.E.D.Okla.1995); *In re Sands*, 166 B.R. 299 (Bankr.W.D.Mich. 1994); *In re Claxton*, 140 B.R. 565 (Bankr. N.D.Okla.1992); *Matter of Coleman*, 98 B.R. 443 (Bankr.S.D.Ind.1989); *In re Courtney*, 79 B.R. 1004 (Bankr.N.D.Ind.1987). This Court holds that while the "minimal standard of living" prong of the "undue hardship" test for discharge of a student loan obligation requires more than a showing of tight finances, it does not require the Debtor to demonstrate that repayment of the loan will cause him and his family to live at or below the poverty level. *In re Stein*, 218 B.R. 281, 287 (Bankr.D.Conn.1998).

The Defendant argues, based on an examination of the Debtor's 1996 income tax return, that the Debtor's monthly income is higher than $4,683.11. Specifically, the Defendant notes that in 1996 Debtor received $2,860 gross income and $1,300 net income from his private practice in 1996 (Deft's Post–Trial Memo of Law, p. 7). However, the Debtor testified at trial that he no longer sees private patients because managed care has severely circumscribed the number of office visits that would be reimbursed. Without insurance coverage, most of his patients would not be willing or able to pay for such services. There appears to be little demand for his non-agency funded professional services. Therefore, the Debtor did not receive income from private patients in 1997 or 1998 and does not expect to receive such income in the future.

---

4. There are two slightly different versions of the federal poverty measure: the poverty thresholds and the poverty guidelines. The poverty thresholds are the original version of the federal poverty measure. They are updated each year by the Census Bureau by factoring in the change in the average annual Consumer Price Index. The thresholds are used mainly for statistical purposes—for instance, preparing estimates of the number of Americans in poverty each year. The poverty guidelines are the other version of the federal poverty measure. They are issued each year in the *Federal Register* by HHS. The guidelines are a simplification of the poverty thresholds for use for administrative purposes— for instance, determining financial eligibility for certain federal programs. Programs using the guidelines in determining eligibility include Head Start, the Food Stamp Program, the National School Lunch Program, and the Low–Income Home Energy Assistance Program. Note that in general, public assistance programs (Aid to Families with Dependent Children and its block grant successor, and Supplemental Security Income) do **NOT** use the poverty guidelines to determine eligibility.

The 1998 HHS poverty guidelines reflect that a family unit of nine (9) is in poverty if the household income is less than $30,450. In applying the poverty guidelines, the *Bryant* Court utilized "net" income rather than "gross" income.

The Defendant also argues that Debtor has overstated the following monthly expenses:

| | |
|---|---|
| Tuition (children's parochial school) | $1,000.00 (amended to $700) |
| Other utilities-Lilco (arrearage installments) | 57.00 |
| Recreation | 50.00 |
| Transportation | 200.00 |
| Medical/Dental | 300.00 |
| Clothing | 300.00 |
| Food | 1,600.00 |
| Charity | 60.00 |
| Life insurance | 50.00 |
| Car insurance | 250.00 |
| Homeowner's insurance | 80.00 |

In accordance with the need to educate his children in conformity with the requirements of his orthodox religion, the Debtor sends his children to parochial schools. The Debtor's only other choice would be to teach his children at home, which would prevent him or his wife from earning a sufficient salary to pay for their necessities. The Debtor's present cost for parochial schooling for those children eligible to attend is approximately $700 per month.

■ Although it is common in a religious community for the community and/or the parochial school to educate an orthodox child without tuition payment, it is unreasonable to expect the parochial school to waive all tuition for the next seven to twelve years for all of the Debtor's seven children. Some payment would have to be made in order to assure that the children receive at least a high school education. Even if the children were to attend public schools, there would be some travel or educational expense needed. This Court finds that $100 per month per child for education and/or day care for the foreseeable future is a reasonable and necessary expense of this Debtor.

■ It is well settled that a federal statute cannot unreasonably interfere with the liberty of parents to direct the upbringing and education of their children. *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Therefore, by enacting the Bankruptcy Code in 1978, Congress did not intend to interfere with a debtor's right to rear and educate his children according to orthodox religious tenets. Hence, the Court finds that the amount expended in this case for parochial school tuition is a reasonable and necessary expense of this Debtor.

■ Although the facts indicate that the Debtor's monthly tuition expense is less than the amount set forth in the Schedule J, the Court rejects the Defendant's argument that the other aforementioned expenses have been substantially overstated or exaggerated, notwithstanding certain minor inaccuracies and misstatements in the Debtor's Schedule J. After reviewing the trial transcript, the Court finds that the inaccuracies were largely immaterial and unintentional. Although the Defendant argues that the Debtor wrongfully listed the $57.00 monthly payment to Lilco for arrearages while Lilco is not listed as an unsecured creditor on Schedule F, the Debtor testified that this expense was incurred as a pre-petition workout so that Lilco would not turn off the electricity in the house. Therefore, it is a reasonable and necessary current expense of the Debtor. While $1,600.00 a month for food would be excessive in a smaller family, the Court does not find such a sum excessive for a family of nine that eats all of its meals at home and

never eats out except for an occasional pizza. Although Mrs. Lebovits' parents provide to the Debtor's family certain groceries, including cereal, milk and juice, it is not unreasonable that the Debtor still expends $400.00 per week to feed such a large brood, including occasional holiday meals. Even if $300.00 per week would be a sufficient allocation for food, the resulting reduction of $400.00 per month would not reduce the Debtor's current monthly expenses sufficiently to enable the Debtor to make a monthly payment on the student loan, while other necessary bills remain unpaid.

■ The Defendant contends that transportation expenses of $200.00 a month are high. However, that amount covers gasoline and repairs for the family's two eleven-year-old cars. The Defendant also contends that monthly insurance payments in the amounts of $50.00 for life insurance, $250 for car insurance and $80 for homeowner's insurance are either inflated or unnecessary expenses of the Debtor. While the Debtor testified that the $250.00 listed as his car insurance payment seemed a bit high, there can be no dispute that New York State requires all automobiles to be insured. Moreover, the Court rejects the Defendant's argument that the Debtor should give up one car in order to free up income to repay the Student Loans. It is almost axiomatic that two working adults with seven children are going to need two cars, especially since the Debtor commutes from Far Rockaway to New Hyde Park and Mrs. Lebovits travels from Far Rockaway to Brooklyn. Although the Defendant contends that the Debtor's mortgage payment includes homeowner's insurance, the insurance component of the mortgage payment is undoubtedly attributed to mortgage insurance. The $80.00 per month payment for homeowner's insurance is a necessary and reasonable expense of the Debtor. Furthermore, the Defendant's argument that the Debtor's term life insurance policy is not a necessity is unfathomable to this Court; surely a man with eight (8) dependents must provide them with some safety net for the possibility of his untimely death.

■ The Debtor testified that his current employer provides health and dental insurance. However, he also testified that non-prescription drugs, toiletries, diapers, eyeglasses and braces were not covered by such insurance. In view of the size of the Debtor's family, $300.00 per month does not seem an exaggerated amount for these items. The Court also finds that it is far from extravagant to clothe a family of nine for $300.00 per month and could probably only be done if such clothing were purchased from a charity as is the case here. Moreover, contrary to the Defendant's argument, the Debtor's household expenditure of $50.00 per month for recreation (including newspapers and magazines) is minimal, at most. Finally, the Defendant argues that the Debtor's $60.00 per month contribution to charity constitutes impermissible tithing (Deft's Post–Trial Memo of Law, p. 10). Congress has recently enacted the Religious Liberty and Charitable Donations Act of 1998, Pub.L. No. 105–183, 112 Stat. 517 (June 19, 1998), to amend the Bankruptcy Code to protect certain charitable contributions. The amendment provides, among other things, that an individual consumer debtor may donate up to fifteen (15%) percent of his income to his church or synagogue. Thus, the Debtor's charitable contribution is well within the permissible limits set by Congress. In fact, if a portion of the $700 monthly tuition paid to the parochial schools the children attend would qualify as charitable tithing, this sum could not be included in tallying the Debtor's income. 11 U.S.C. § 548(d).

In view of the foregoing, the Debtor has satisfied the first prong of the "undue hardship" test by showing that he cannot maintain a minimal standard of living for himself and his dependents if he is required to repay the Student Loans.

**(2) *The Debtor's State of Financial Affairs is Likely to Persist for Significant Portion of Repayment Period***

■ The second prong of *Brunner* requires a showing that the Debtor's current financial condition is likely to persist for a significant portion of the years remaining of the repayment period of the Student Loans. *Brunner*, at 396. This requirement has been interpreted to mean that the Debtor's current financial hardship is likely to be long-

term and continue into the foreseeable future. *In re Muto*, 216 B.R. 325, 330 (Bankr. W.D.N.Y.1996).

The Debtor is 40 years old and not the typical recent graduate with his entire career ahead of him and an untested earning potential. The evidence at trial demonstrated that he is currently earning very close to the maximum salary he can expect to receive in his field of social work without returning to school and incurring additional student loan liability which he has no hope of repaying. Although he has received, and can expect, modest cost-of-living raises, they are not designed to produce a higher household income. Cost-of-living raises are by definition tied to increased living expenses and designed to maintain the status quo. Therefore, they will not generate future income which will enable the Debtor to repay his Student Loans. Although this Court recognizes that sometimes young debtors fresh out of school, with well-paying jobs, large educational loans and few other debts, file bankruptcy petitions in an attempt to discharge their educational loans before the loans become due, this is clearly a distinguishable situation. The Debtor is not trying to abuse the system; he merely wants a fresh start so that he has an opportunity to pay his current debts as they become due.

Due to the ages of the Lebovits children, Mrs. Lebovits cannot work full-time and her employment for the foreseeable future will necessarily be confined to low-paying part-time positions during a significant portion of the repayment period.

The Lebovits family's current expenses are not likely to decrease within the foreseeable future. In fact, the Lebovits children, who account for much of the Debtor's expenses, range in age from approximately 15 months to 11 years. It is reasonable to infer that the Debtor's expenses attributable to his children will likely extend or even increase for a significant portion of the repayment period. Furthermore, from the age and condition of the family automobiles, it is reasonable to infer that repair or replacement will be necessary during the repayment period.

In view of the foregoing, the Debtor's financial condition is likely to persist for a significant portion of the repayment period. Therefore, the Debtor has met the second prong of the *Brunner* test.

### (3) *The Debtor Has Made Good Faith Efforts to Repay the Loan*

The third and final prong of the *Brunner* test requires a showing that the Debtor has made a good faith effort to repay the Student Loans. *Brunner*, at 396. Among the hallmarks of a good faith effort include an attempt to "maximize income and minimize expenses." *In re Rose*, 215 B.R. 755, 765 (Bankr.W.D.Mo.1997). Since a debtor's good faith is interpreted in light of his ability to pay, a complete failure to make even minimal payments on a student loan does not prevent a finding of good faith where the debtor never had the resources to make payments. *Rose*, at 765–66, *In re Clevenger*, 212 B.R. 139, 146 (Bankr.W.D.Mo. 1997); *In re Rosen*, 179 B.R. 935, 941 (Bankr.Or.1995). In this case, the Debtor consolidated the Student Loans and actually made a few payments until the payments interfered with his ability to cover mortgage payments, food and educational expenses.

To discharge a student loan, a debtor must show that repayment will impose an undue hardship on the debtor **"and the debtor's dependents."** 11 U.S.C. Sec. 523(a)(8)(B). Therefore, the degree of sacrifice required by living on "minimized" expenses must be analyzed with reference to its impact on the Debtor's family, including his children. The Debtor has made a reasonable effort to minimize expenses and thereby maximize his household's income. The family's lifestyle is hardly lavish. There are virtually no vacations, and family entertainment is practically non-existent. They rely on charitable gifts of food and clothing in order to make ends meet. As one bankruptcy court has noted in applying the *Brunner* test, a key factor in determining dischargeability is the impact that repayment would have on a debtor's children. *In re Windland*, 201 B.R. 178, 183 (Bankr.N.D.Ohio 1996). The *Windland* Court was apprehensive about imposing a "Spartan" life on the debtor's children, recognizing that their childhood years would be "barren of the most minimal experi-

ences that are not provided through their respective schools" and that the children would suffer if the debtor were unable to "begin to plan to contribute funds toward their higher education." *Windland,* at 183. With this in mind, this Court is reluctant to find an absence of good faith and impose a never-ending obligation on the Debtor to repay the Student Loans when it would impact so harshly on the Lebovits children.

The Defendant argues that the Debtor has not made a good faith effort to repay his Student Loans, as evidenced by the fact that he has made only three payments. However, based on the circumstances of this case, the Court finds that the Debtor acted in good faith.

Consequently, the Debtor has met the third prong of the *Brunner* test. Since all three prongs of the *Brunner* test are satisfied, the Court finds that the debt is dischargeable as an undue hardship on the Debtor and his dependents.

Bankruptcy courts are often called upon to fashion unusual equitable remedies. This Court believes that there are certain circumstances that would permit it to find that a portion of a student loan is nondischargeable. However, the facts of this case preclude such a finding, since the Debtor's monthly household expenses, which are likely to persist during the entire repayment period, are much higher than the monthly household income.

## CONCLUSION

1. This matter is before the Court pursuant to Section 523(a)(8)(B) of the Bankruptcy Court Fed.R.Bankr.P. 7001(6).

2. Jurisdiction is conferred by 28 U.S.C. § 1334, and the proceeding is "core" by virtue of 28 U.S.C. § 157(b)(2)(1).

3. The Debtor's debt of $49,050.12, plus per diem interest of $12 .07, is dischargeable in this Chapter 7 case.

4. The Debtor's counsel is directed to settle a judgment in accordance with this decision on eight (8) days' notice to all parties having an interest herein.