In re Joann CONNOR, Debtor.

Joann CONNOR, Plaintiff,

v.

STATE OF MICHIGAN DEPARTMENT OF TREASURY, Defendant.

Bankruptcy No. 82–00472.
Adv. No. 86–7597.

United States Bankruptcy Court,
E.D. Michigan, S.D.

March 15, 1988.

---

Peter M. Doerr, Mount Morris, Mich., for plaintiff.

Constance Hobson, Detroit, Mich., for defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: UNDUE HARDSHIP PER 11 U.S.C. § 523(a)(8)**

ARTHUR J. SPECTOR, Bankruptcy Judge.

The above debtor filed for relief under Chapter 7 of the Bankruptcy Code on May 3, 1982. A discharge of the debtor's debts was entered on September 28, 1982, except, by operation of 11 U.S.C. § 523(a)(8), for three governmentally guaranteed student loans. The case was then closed on October 29, 1982. On November 10, 1986, the debtor filed the above adversary proceeding seeking a determination that having to repay the guaranteed student loans would impose an undue hardship upon her and so those debts should be deemed discharged in her bankruptcy case.

In an affidavit from the Supervisor of the Claims and Collection Unit of the Michigan Guaranteed Student Loan Program (Exhibit # 7), the defendant stated that the minimum monthly payment of $50.00 on the amount due would be acceptable. The balance due on the unpaid student loans as of October 30, 1987 was $6,788.82, with interest accruing at 93 cents per day.

In her pre-trial memorandum, the debtor argued that the Court would find that "(1) she has little accumulated wealth and little prospect of acquiring any; (2) she has little chance of obtaining steady employment and the income she has had and can expect in the future is very low; (3) she will not earn enough to maintain a minimal standard of living; and (4) after paying her

expenses of living, she will have no income left to pay the debt without reducing what is needed to live on."

■ The defendant responded in its trial brief that the debtor was a single woman with no dependents, in good health, living with a relative, and the possessor of a teaching certificate and of the following educational degrees: B.A. in music; B.M. in music therapy; M.A. in Education Curriculum and Instruction. The defendant argued that the debtor had not met the requirements of "undue hardship" contemplated by Congress when it enacted 11 U.S.C. § 523(a)(8) and that the debtor's circumstances did not compare with those of other debtors who had had their educational debts discharged under this section. The case was tried on November 17, 1987.[1] The following constitute our findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

The debtor is 40 years old and in good health. For the past three years she has lived with an aunt who provides food and lodging. She has no money of her own. The debtor does the cooking and most of the cleaning. She worked for the Lansing Public Schools as a coordinator before quitting in August, 1982 to pursue a business venture. The debtor claims that the failure of that business was the precipitating factor in her filing for bankruptcy. After the conclusion of the bankruptcy case, the debtor worked as a training coordinator in a Chicago suburb for approximately one year until July, 1984 when she left because she felt she was earning too little and because she felt she had been unjustly passed over for promotion. The debtor

graduated from Michigan State University in 1975 with a masters in education and a bachelor's of music therapy and has also taken a few courses toward earning her Ph.D. The debtor obtained her teaching certificate in 1975 and has kept it updated since.

The debtor testified to having made the following efforts at gaining employment: in August, 1984, she tried to get a job with Oakland University as a director of equal opportunity; also in August, 1984, she applied as personnel director at the Juneau Public Schools in Alaska; in November, 1984, she applied to be a development specialist for the City of Saginaw; in August, 1985, she applied for a position as director of the Public Education Fund for the Flint Public Schools. She also considered self-employment as an educational consultant. She thought she could use her training in curriculum development in that endeavor and believed there was a market for those skills. The debtor also testified to having been turned down for various jobs at Sunshine Foods, K–Mart, McDonalds, the YWCA, a position in telemarketing, magazine subscription sales and with the Genesee County Library as Director of Volunteers, for reasons of being over-qualified. All told, the debtor claims to have been advised that she was "over-qualified" 40 to 50 times. The debtor further testified that she has sought over 100 jobs in her field since July, 1984 to no avail. Altogether she estimates she has unsuccessfully applied for 200–300 jobs.

On cross-examination she testified that she last applied for a job the previous week

---

1. A lapse of four years occurred between the original closing of the bankruptcy case and the filing of the complaint in this adversary proceeding. While we note that no statute or rule precluded the debtor from filing the complaint so late, and that the defendant did not raise or argue any equitable preclusion, we do not feel that a delay of four years is what Congress intended. We believe the proper procedure would have been to file the complaint prior to the entry of her discharge in 1982.

Despite our unease at the lateness of this complaint, it does seem that courts ought to be better able to decide these issues with 20–20 hindsight than by forecasting the debtor's future

job prospects. Moreover, the delay was more harmful in this case to the debtor than to the defendant. From September 28, 1982 through the present the debtor has lived without any stay or discharge preventing the defendant from seeking to collect the debt due it, as the statute provides that student loans *are not discharged unless* the court finds there would be an undue hardship. Since no such finding has yet (or ever) been made, the defendant could have attempted to collect this debt at any time since September 28, 1982. The fact that it hasn't (or couldn't) is strong evidence that the debtor does not need a discharge to prevent undue hardship.

and had been looking for a position in business. The debtor admitted to having no expenses and no dependents. She also stated that she had not applied as a substitute teacher nor had even checked to see if any school districts needed substitute teachers. We accept, (with reservations as to the number of unsuccessful job applications), all of the foregoing as true.

The bankruptcy courts have wrestled with the concept of "undue hardship". The problem is how to fairly determine if the debtor's condition would present an undue hardship if the student loan is not discharged. Courts have tried to avoid the inherently subjective evaluation by attempting to fashion "objective" tests.

One early case, *In re Johnson*, 5 B.C.D. 532 (Bankr.E.D.Pa.1979), set forth a three-step test. The first step was to examine the debtor's future financial resources and expenses and determine whether the income will be sufficient to support the debtor and the debtor's dependents at a minimal standard of living while allowing for repayment of the student loan. The second step was to determine a debtor's "good faith"; i.e.: whether the debtor had made a bona fide attempt to repay the loan. If the debtor "passes" the first test, but "flunks" the second test, then the third step is to examine the policy behind excepting student loan debts from discharge, and determine whether that policy would be offended by granting a discharge in that case. This test was more or less adopted in *In re Brunner*, 831 F.2d 395, 396 (2nd Cir.1987).

"Undue hardship" is not defined by the Bankruptcy Code. Instead, determining its definition is a task left to judges who must examine closely the facts of each case. Judges have devised various tests intended to avoid the discomfort of having to subjectively pass upon a debtor's personal life. It is no doubt hoped that by having a handy objective test, certain factors can be plugged into an equation which produces an answer quickly, without the troublesome intervention of subjective feelings. While any one of the tests suggested no doubt removes some of the apparent subjectivity from the process, we feel that

determining undue hardship is inherently and unavoidably a subjective problem. The judge still has to make a subjective decision, whether it be as to the reasonableness of a person's estimation of expenses or disposable income or to a person's future prospects for employment or increased earning capacity, or to an evaluation of a debtor's "good faith". One has to examine each debtor individually and make decisions at least as to the factors that would go into one's "objective" equation.

Congress intended that student loans "should not as a matter of policy be dischargeable before [s]he [the debtor] has demonstrated that for any reason [s]he is unable to earn sufficient income to maintain [her]self and [her] dependents and to repay the educational debt." Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. 137, 93rd Cong., 1st Sess. Part 2, p. 140, n. 15. The Commission set up the following test:

> In order to determine whether non-dischargeability of the debt will impose an "undue hardship" on the debtor, the rate and amount of his future resources should be estimated reasonably in terms of ability to obtain, retain and continue employment and the rate of pay that can be expected. Any unearned income or other wealth which the debtor can be expected to receive should also be taken into account. The total amount of income, its reliability, and the periodicity of its receipt should be adequate to maintain the debtor and his dependents, at a minimal standard of living within their management capability, as well as to pay the educational debt.

*Id.* at p. 140–141.

Rather than try to formulate our own "objective" test or to rely on one already suggested, we will simply look to what we feel to be Congress' intent behind enacting this exception to discharge and try to come to a common sense feel for what constitutes an undue hardship. Clearly, the overall intent of Congress was to make governmentally guaranteed student loans non-dischargeable, subject only to two exceptions. Given this concept, we then have

to examine the only exception argued to us; will denying a discharge pose an "undue hardship" to this debtor?

Where this case differs radically from the cases we have examined is in the circumstances of this debtor's unemployment history. Most cases involve a debtor with ascertainable income or monthly expenses. Getting a feel for a person's net income is a relatively simple arithmetic problem, providing one with a starting point for determining undue hardship. Put simply, how much disposable income does the debtor have? Presumably, since the debtor here has no wealth or income whatsoever, the existence of any obligation at all creates an undue hardship. Therefore, the narrow exception to § 523(a)(8) is met (and would be met in all such circumstances).

However, we feel that this result is not what Congress contemplated when it provided the undue hardship exception to non-dischargeability. Accepting the debtor's premise—that she is destined forever to a life without hope of gainful employment or the enjoyment of physical possessions—and then applying the following "but for" test, we determine that this debtor's lot would not benefit in any cognizable fashion if the discharge she received over five years ago were determined to extend to these student loans. We state a novel viewpoint on this topic. In our view, a debtor without present income or wealth and without reasonable prospect of future income or wealth is not entitled to have his or her student loans declared discharged on account of "undue hardship"! We conclude thusly because of our recognition of one overriding practical imperative—a discharge of the debt is irrelevant. If a penurious debtor's student loans are wiped clean, will that debtor live any better? Of course not. The debtor would "take home" not one cent more on account of a discharge, since, by definition, the debtor has no income (or an income so low as to be beyond the reach of garnishments); and there would be no non-exempt wealth to

levy upon. In short, the uncollectible student loan debtor needs no discharge at all—be it for student loans or any other type of debt.[2]

On the other hand, what does qualify as an "undue hardship" case is one where a debtor with dependents to care for has only a minimally adequate income. A garnishment of this debtor's wages would likely inflict a hardship. Alternatively, a not-so-minimal income could be subject to extraordinarily high expenses of living due to any number of causes, such as ongoing medical bills. This too would be a fair predicate for a finding of undue hardship.

We believe this "but for" test is more practical than the other suggested judicial aids. A court of equity should grant equitable relief only if the relief will accomplish some worthy purpose. 27 Am.Jur.2d *Equity,* § 102 (1966). From a practical standpoint, if we were to agree that this debtor has no reasonable likelihood of obtaining gainful employment in the reasonably foreseeable future, we would have to hold that since she would not be harmed if the student loans remained her debts, hers is not an "undue hardship" case. At present, she is uncollectible and even if she were to find a minimum wage job, she would still be immune to garnishment by operation of federal law and to levy by operation of state exemption law.

If instead we apply the more traditional test of undue hardship, we reach the same result. The first prong of the *Johnson* test is impossible of application here since the debtor's future financial resources are, on this record, impossible to determine. The debtor fails the good faith test since some payment could have, and so should have, been made when she was gainfully employed. Last, we do not feel the policy of excepting student loans from discharge would be well served if a discharge were granted in this case.

We so hold even though we are convinced that the debtor has seriously looked

---

**2.** Why such a debtor bothers to file bankruptcy at all (except perhaps to avoid bill collector harassment) is the bigger question.

for and genuinely wants to work. As cited earlier, the debtor has applied for positions as Equal Opportunity Director, Personnel Director, Development Specialist and Public Education Fund Director. In addition, she claims to have applied for over 100 jobs in her field. She has also been turned down as over-qualified for dozens of jobs in service industries. At the risk of sounding presumptuous, however, we feel the debtor has not been realistic in some of her employment goals. The Court has no evidence before it on the demand for music therapists. Since the debtor seems qualified and has unsuccessfully applied often for such a position, we will assume that the market for music therapists is tight and competition for the jobs is keen. When she did look outside her field for employment, she mostly sought executive positions. When those efforts did not pan out, she sought unskilled work in low-paying service industries.

The debtor testified that she is still looking for work and had applied for work as recently as the week previous to trial without apparent immediate success. The debtor also claims that Michigan State University has hampered her job prospects by noting on her transcript that she owed a debt to the university. She said she tried unsuccessfully to get that information removed from those records. This, we take it, is her candidate for an extraordinary "additional cicumstance ... indicating a likelihood that her current inability to find any work will extend for a significant portion of the loan repayment period." *Brunner,* 831 F.2d at 396. She further testified that although she has her teaching certificate and has kept it current, she has not applied for any teaching positions because of the MSU-created transcript problem. While she substitute-taught in 1971, she believes that obtaining a job as a teacher now would be difficult because of her long absence from the classroom. She has not, however, applied as a substitute teacher since, nor inquired into whether any school districts have a need for her services.

The Court is troubled by the debtor's failure to have ever tried to pay back any portion of the loan. After extension, the loans became due on June 26, 1980. The debtor acknowledged that prior to quitting her employment with the Lansing Public Schools, she earned approximately $23,000 and that she did not recall ever having made any payments on the loan. Nor did she ever request a deferment. *See Brunner,* 831 F.2d at 397. This suggests to us a lack of good faith.

It is fair to compare what other courts have done in these types of cases, even though the question usually turns on the unique facts of each case. The closest case to the one at bench is *In re Holzer,* 33 B.R. 627, 11 B.C.D. 619 (Bankr.S.D.N.Y.1983). In *Holzer,* the plaintiff received guaranteed student loans from the State of New York totaling $14,500 in order to attend medical school in Spain. The plaintiff filed a Chapter 7 bankruptcy on August 16, 1982 and listed as his only debt the money owed to the State of New York for his loans. It was clear that the sole purpose behind the plaintiff's bankruptcy was to obtain a discharge of his student loan indebtedness. The plaintiff never sought a deferment nor made any payments upon his student loans. The plaintiff was a licensed pharmacist in New York and Pennsylvania and had worked as a pharmacist prior to leaving for Spain. He also had worked for many years as a teacher of library science in New York. He held a master's degree in library science. He had held a New York State teacher's license which expired. The plaintiff obtained his medical degree in Spain and returned to New York in January, 1982. The plaintiff was 47 years old and in good health with no physical or mental infirmities. Although the plaintiff was married and had one child, both the wife and child resided in Spain and were not dependent on the plaintiff. At the time of the bankruptcy, the plaintiff resided with his mother, who was also not dependent on him. In fact, as in this case, the plaintiff's living expenses were paid for by a relative (his mother; her aunt). He, too, claimed no income and no assets of substantial value. The plaintiff claimed to have been unemployed since January, 1982, having failed to find employment in the fields of medicine,

teaching, library science and pharmacology. Yet, the plaintiff had not sought employment in other fields and contended that "despite his academic and professional credentials, he (was) unable to obtain employment in the fields for which he (was) trained and (had) no prospects of obtaining such employment in the future." 33 B.R. at 629.

Applying the three-step test proposed by *In re Johnson, supra,* the court held that the plaintiff was not entitled to a hardship discharge. In the court's view, examination of the debtor's circumstances indicated that there was only a present inability to repay the student loans. The court further found that the plaintiff's contention that he was unemployable was erroneous and that the plaintiff's lack of hope in ever finding a job in any one of his fields of training was groundless. 33 B.R. at 631. The court considered it implausible that such a highly educated individual with no physical or mental infirmity could not obtain any gainful employment, even though such employment may be in fields in which the debtor had no formal training. Limiting his employment search to solely the fields in which he was trained was "an irresponsible decision so to limit himself and accordingly, any resulting hardship (was) of his own making ...". 33 B.R. at 632. The court opined that one should still seek employment even if outside of one's training and obtain enough compensation to meet one's obligations. As long as one could be employed in any area of endeavor, one should not be heard to complain if the rewards are less than what was hoped for while studying.

While the circumstances of the *Holzer* case are certainly more egregious than those in the present case, the case is similar enough to ours to be persuasive authority. The debtor in our case, as in *Holzer* and the cases cited therein, must be held responsible to keep trying to find employment of whatever kind.

In conclusion, we find that the debtor has sought employment in her field and in executive positions, but we question the reasonableness of the debtor's expectations of obtaining many of the positions she sought. We find that the debtor has also unsuccessfully applied for unreasonably low-skilled positions but has inexplicably failed to apply for a type of job for which she seems to be reasonably well-qualified and for which she could have expected better results, to-wit: teaching. The debtor is obviously a healthy, intelligent, articulate, well-educated individual. Our national economy has produced almost 13 million new jobs in the five years since she received her discharge[3] and there are still today (although maybe not in Flint) numerous jobs a-begging. Where there is a will, there is a way. Finally, we also find that the debtor has shown a lack of good faith in never having even attempted to pay back any portion of her loan while gainfully employed. Because we find this debtor capable of gainful employment, we refuse to make a finding of "undue hardship" based solely on her present inability to find employment. We hold then, that the debtor's discharge did not encompass her obligation to the defendant on account of the student loans. A judgment consistent with this opinion will be entered contemporaneously herewith.

---

**3.** In 1982, the Bureau of Labor Statistics reported that 99,526,000 civilians were employed. In 1987, employment had risen to 112,440,000, an increase of 12,914,000. On the local level alone, the Michigan Employment Security Commission reported that "[p]ublic sector positions rose by 2,000 as additional job slots were realized by both state and local education institutions as the 1987–1988 school year began." Michigan Employment Security Commission, "Saginaw, Bay City, Midland Labor Market Review," Vol. VII, Nos. 9–12 (December 1987).