In re Steven L. WALLACE, Debtor.

United States Department of
Education, Defendant–
Appellant,

v.

Steven L. Wallace, Plaintiff–Appellee.

No. CV 99–01605 MMM.

United States District Court,
C.D. California.

July 10, 2000.

Alejandro N. Mayorkas, Assistant United States Attorney, Office of U.S. Attorney, Criminal Division, Kurt E. Ramlo, Assistant United States Attorney, Office of U.S. Attorney, Civil Division, Los Angeles, CA, for appellant.

Henry Glowa, Henry Glowa Law Offices, Los Angeles, CA, for appellee.

## ORDER RE APPEAL FROM BANKRUPTCY COURT'S ORDER GRANTING DEBTOR'S MOTION FOR SUMMARY JUDGMENT

MORROW, District Judge.

This is an appeal by the United States Department of Education ("Education" or "the Department") from an order of the United States Bankruptcy Court for the Central District of California dated October 27, 1998. This court has appellate jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

The Department contends that the bankruptcy court erred when it entered summary judgment in the debtor's favor discharging his student loans pursuant to former 11 U.S.C. § 523(a)(8)(B). Specifically, it asserts that Wallace failed to carry his burden of proving that the continued obligation to repay the loans would constitute an "undue hardship." Additionally, it contends that the bankruptcy court erred in making findings of fact on disputed matters and/or in determining that facts were without substantial controversy. Finally, it asserts that the bankruptcy court erred in denying its motion for summary judgment against Wallace.

Because Wallace has the burden of establishing "undue hardship," summary judgment was properly entered in his favor only if no reasonable trier of fact could find other than for him on the issue. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In order to establish "undue hardship," a debtor must demonstrate (1) that, given his current income and expenses, he cannot maintain a minimal standard of living if required to repay the loans; (2) that his inability to repay is likely to persist for a significant portion of the repayment period; and (3) that he has made good faith efforts to repay the loans.

The Department adduced evidence that Wallace's income will increase, possibly by more than half, during the loan term. The bankruptcy court made no specific finding regarding Wallace's likely future income, and the record raises the possibility that factual issues exist regarding proper interpretation of the Los Angeles Unified School District salary schedule. Other evidence shows that Wallace's ability to pay would be enhanced if he elected either an income contingent plan offered by the Department, or other alternative plans that adjust payments according to income, and forgive the remaining loan balance at the end of the term. This evidence too warrants further findings regarding Wallace's future ability to pay.

As respects Wallace's good faith efforts to repay the loans, the bankruptcy court found that he made payments "as long as he could." It did not make findings, how-

ever, regarding Wallace's continued good faith, or lack thereof, when informed of alternative payment options during the course of proceedings in this case.

Because continuing inability to pay and good faith efforts to repay are elements that must be proven to establish undue hardship, the bankruptcy court's order granting Wallace's motion for summary judgment is reversed, and the matter is remanded for further record development and factual findings on these issues as detailed in the sections of this order which follow.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Debtor Steven Lawrence Wallace [1] earned his bachelor's degree in philosophy at UCLA in June 1983.[2] In August 1987, he entered Loyola Law School in Los Angeles, and earned his Juris Doctor degree in May 1990.[3] After passing the July 1990 bar exam, Wallace began his legal career as a trial attorney for Wausau Insurance Company. He earned $41,000 in 1991, and $67,000 in 1995.[4] Wallace financed his undergraduate and law school education, in part, through student loans. While he was employed as a lawyer, he made regular payments on the educational loans, and either remained current in his payments or, when necessary, sought and received deferments. In 1995, he consolidated his government loans under the Direct Loan Program, and elected to pay at a variable rate over 30 years, commencing with payments of $447.83 per month in 1995, and increasing gradually to payments of $594.07 per month in the year 2023. Full payment was to be made by the year 2025.[5] In addition to the government

loans, Wallace has four loans held by Hemar Insurance Company of America. The Hemar loans totaled $38,000 as of October 1998.[6]

Law practice caused Wallace significant stress, which precipitated or exacerbated mental conditions including depression, chemical dependency, post-traumatic stress disorder, and obsessive-compulsive disorder. Wallace left his job at Wausau, worked for a short time at a legal head hunting firm, and then did temporary work. Based on career counseling advice he received at UCLA, Wallace decided to leave the law altogether in favor of a career in teaching. Although he had not obtained a teaching credential, Wallace began working for the Los Angeles Unified School District ("LAUSD") as a kindergarten teacher. In this new job, he earned approximately $30,000 per year, and was unable to pay his debts.

At the time of the summary judgment hearing, Wallace earned $1,902.47 net every four weeks as a kindergarten teacher. His net monthly income, based on 13.05 paychecks per year, was thus $2,068.42.[7] Wallace is eligible for four non-consecutive months of vacation each year. He does not seek supplemental employment during these periods, and on his principal's advice, uses the time instead for rest, rejuvenation, and preparation of lesson plans for the upcoming term. Wallace acknowledges that more experienced teachers supplement their income by substitute teaching during vacation periods.

Wallace filed for relief under chapter 7 of the Bankruptcy Code on January 14, 1997. On April 21, 1997, he filed an adversary complaint seeking a declaratory judgment that his law school loans were dis-

---

1. Steven Wallace has changed his name to Or Li Geuel Wallace. See Appellant's Excerpts of Record ("E.R."), at 144–147.

2. E.R. at 326.

3. E.R. at 327–28.

4. E.R. at 245.

5. E.R. at 45–46.

6. E.R. at 599:8–11. The bankruptcy court's order discharged both the Department of Education and Hemar loans. Hemar has not appealed the bankruptcy court's order.

7. E.R. at 307.

chargeable as an "undue hardship" under former 11 U.S.C. § 523(a)(8)(B).[8] Hemar and Education answered; in addition, Hemar filed a counterclaim seeking judgment in its favor for the amount of its student loans.

On November 21, 1997, at his request, Education supplied Wallace with information regarding repayment options for his consolidated student loans. The fact sheets and charts he received described four repayment options—the "Standard Repayment Plan," the "Extended Repayment Plan," the "Graduated Repayment Plan," and the "Income Contingent Repayment Plan."[9] There was also a document titled "Repayment Estimates," which listed the lowest monthly payment as $390, based on a loan balance of $61,867. The estimate noted: "Examples are estimates for comparison of options, actual amounts may vary."

The description of the "income contingent" plan contained in the materials states:

"The Income Contingent Repayment Plan allows you to repay your loan as a percentage of your income. In general, the amount you repay depends on the amount you borrowed and begins at 4 percent of your income for loans of $1,000 or less. The percentage of income increases at the rate of 0.2 percent for each additional $1,000 borrowed, up to a maximum of 15 percent for loans of $56,000 or more. However, your monthly payment will never be more than 20 percent of your discretionary income. Discretionary income is your federal adjusted gross income minus the poverty level for your family size. If the monthly income repayment is calculated to be less than $15.00, no payment is required."

\* \* \*

". . . . [I]t's possible you won't make payments large enough to pay off your loan in 25 years. If this happens, after 25 years (excluding periods of deferment, forbearance, [etc.]), the unpaid amount of your loan will be discharged, and the amount discharged will be considered taxable income."[10]

On November 11, 1997, Wallace completed an application for the "income contingent" plan. He contends that Education did not accept his application or send him any payment estimates for the income contingent plan at this time.[11]

On December 2, 1997, the Department filed a motion for summary judgment, which the bankruptcy court heard initially on December 23, 1997. It did not issue a ruling at that time, but continued the hearing to February 18, 1998, to permit Wallace to exhaust administrative remedies and submit medical evidence.[12] The February 18 hearing date was subsequently

---

8. Appellant's Opening Brief ("AOB") at 3. Except as noted, Wallace does not dispute the government's account of the proceedings.

9. Appellee's brief, Appendix "A."

10. Id.

11. The 1997 Health & Human Services Poverty Guidelines list the poverty level as $7,890 for a single person residing in any of the contiguous 48 states. See E.R. at 268. The Department of Health & Human Services web page provides the guidelines for several years, and links to the pages of the Federal Register where they are promulgated. See http://aspe.hhs.gov/poverty.

12. In an affidavit opposing the Department of Education's motion for summary judgment, Wallace represented that he had applied for the income contingent plan. See Appellee's Brief, Appendix "A." At the hearing on the motion, the Department informed the court that "Wallace has indicated he cannot make the scheduled plan payments that arise under a chart under the income contingent plan," and explained that he thus "ha[d] the option of replying-applying under a special circumstances regulation. He needs to provide information establishing that special circumstance." E.R. 167:15–21. Based on this, the court stated: "[T]his looks like a matter we should put off until we find out what's the result of the administrative process." E.R. 168:6–8.

continued by stipulation of the parties to March 31.

On December 30, 1997, while proceedings regarding the motion for summary judgment were in abeyance, Wallace traded in his 1990 convertible Mazda Miata for a used 1997 Toyota Tacoma truck that had 7,334 miles on the odometer. Under the purchase contract, Wallace received a $2,200 trade-in credit for his Miata, which reduced the amount financed, at 19.9%, to $14,170.77. Wallace obligated himself to make 59 monthly payments of $385.94 over five years, resulting in a total purchase price of approximately $26,000.[13] The timing of Wallace's purchase appears to have been dictated, at least in part, by serious mechanical difficulties with his Mazda.

At the March 31 hearing, the court noted that it had continued the matter so that Wallace could explore further the possibility of obtaining a feasible payment schedule administratively. Wallace's attorney indicated that he had "submitted one application to the Department of Justice, and just recently [had] authorized me to prepare a letter to—directly to the Department of Education."[14] The Department reiterated its position:

"MR. RAMLO: Quite frankly, your Honor, Education believes that Mr. Wallace can make repayment of his loans."

\* \* \*

"In addition, his failure to make any attempts with Education to craft an alternative repayment plan or to apply for any of these special circumstances, deferments, forebearances, et cetera, show[s] a lack of good faith to reach some kind of repayment agreement with the Department of Education. On those two grounds alone, Education submits that summary judgment in its favor is appropriate."[15]

Following discussion regarding Wallace's inability to file medical proof, the bankruptcy court inquired further of Education regarding payment plans:

THE COURT: Well, assuming I could find, sir, that he could pay $100 a month toward his student loans for the long term, where would that get him?

MR. RAMLO: I believe if the Court were to make such a finding, it merely denies his undue hardship discharge. I would—Education would prefer that this Court make a finding that Mr. Wallace can live under the myriad repayment plans that Education offers. If Mr. Wallace has the ability—

THE COURT: Does Education have one that provides for paying $100 a month on a loan this size?

MR. RAMLO: It's theoretically possible, your Honor. But under the program, it's incumbent upon the Debtor to apply to Education for such a repayment plan. The Debtor has made no request, whatsoever. He has made a request to be placed under the income contingent repayment plan, which would require him to make payments of $369 a month. He contends he cannot make such a payment.

"He has not made any request for the other special circumstances cases where the Secretary of Education has the discretion to craft a repayment plan to fit his particular circumstances. But it's incumbent upon the Debtor to make that request.... Education cannot operate in a vacuum, cannot be expected to extend a repayment plan to a Debtor who chooses not to cooperate."[16]

The bankruptcy court asked the Department's lawyer to explain how payments are calculated under the income contingent plan, and he responded in detail. Following this, the court and Education's counsel engaged in a lengthy discussion of interest

---

13. E.R. at 306.

14. E.R. at 176:22–25.

15. E.R. at 178:10–11, 179:5–11.

16. E.R. at 180:11–181:12.

rates and the federal poverty guidelines.[17] Counsel made it clear that under a 25–year income contingent plan, whatever balance remains at the end of the term is forgiven.[18]

At the conclusion of the March 31 hearing, the bankruptcy court invited Hemar and Wallace to file their own motions for summary judgment. Wallace filed his motion in May 1998. Hemar filed two motions, addressed respectively to Wallace's adversary complaint and to its counterclaim. The bankruptcy court heard further argument on all four motions on July 28, 1998. Thereafter, Wallace filed the amended declaration of his former therapist, Stephen L. Beren. Beren, who had treated Wallace during the time he practiced law and had spoken with him by telephone since, diagnosed Wallace with post-traumatic stress disorder, depression, generalized anxiety disorder, and a possible eating disorder. He opined that "the practice of law was a significant contributing factor to several of the [foregoing diagnoses], including depression and generalized anxiety disorder."[19] He also noted that "Wallace's depression was severe and immobilizing [and that the] more he practiced law, the greater his anxiety and depression became." He stated that Wallace "appear[ed] to be doing much better[, and that he did] not suffer from depression or anxiety to the same degree he did while practicing law."[20]

On October 27, 1998, the parties appeared for continued argument on the cross-motions for summary judgment. At that hearing, Education again argued that Wallace

"ha[d] the option of applying for a 25 year program where he pays only what he can afford, and then the remainder of the balance is forgiven by the Secretary of Education. Education has structured

its direct loan program to obtain whatever payments the student loan borrower can make. And if it cannot receive total payment, the Secretary still desires to receive partial payment. And this Debtor has that ability to make partial payments."

THE COURT: Well, partial payment including paying less than the interest?

"MR. RAMLO: That's correct, your Honor. Under the direct loan program, a Debtor can be current and deemed current, and pay nothing per month."[21]

After noting that the loan forgiveness program did not apply to the Hemar loan, and that the balance on the Hemar loan was more than $36,000, the bankruptcy court concluded:

"Well, I think this is a case where the Plaintiff has to—[is] entitled to summary judgment. The total amount outstanding is nearly $120,000. The Debtor has shown that the Debtor's medical condition does not permit him to practice law. And given what he is able to do, and what his current and prospective income—his current income is, what his likely prospective will be, it's my judgment that continuation to owe these sums will impose an undue hardship on him. The Court notes that under 9th Circuit law, the Court is not permitted to find that part of a loan is non-dischargeable and part of it—a part has to be paid and a part does not. It's either all or nothing under 9th Circuit law. So, summary judgment is awarded to the Debtor."[22]

On December 29, 1998, the bankruptcy court entered the findings of fact and conclusions of law lodged by Wallace, and on February 1, 1999, entered judgment for Wallace. The bankruptcy court's findings of fact and conclusions of law state:

17. E.R. at 180–190.

18. E.R. at 186:12–15.

19. E.R. at 580.

20. E.R. at 581.

21. E.R. at 596:13–597:1.

22. E.R. at 599.

*FINDINGS OF FACT*

"1. Between 1987 and 1990, Plaintiff, OR LI G. WALLACE (fka STEVEN L. WALLACE), obtained student loans to attend law school from, among others, Norwest Bank South Dakota, N.A. ('Norwest'). The loans obtained from Norwest were insured by defendant, HEMAR Insurance Corporation of American ('HICA')."

2. In 1995, Plaintiff consolidated certain other student loans under the William D. Ford Direct Loan Program from defendant, the Department of Education ("Education").

3. Plaintiff made payments on the HICA and Education loans as long as he could.

4. Plaintiff suffers from a medical condition which does not allow him to practice law any longer.

5. On January 14, 1997, Plaintiff filed a petition in bankruptcy.

6. On April 21, 1997, Plaintiff filed a complaint to determine the dischargeability of his student loans.

7. As of the date of this hearing, Plaintiff owed HICA approximately $37,795.00, and owed Education approximately $81,000.00.

8. Plaintiff earns approximately $2,000.00 per month as a kindergarten teacher for Los Angeles Unified School District and has monthly expenses of approximately $1,972.18.

*CONCLUSIONS OF LAW*

"1. Based on Plaintiff's current monthly income and living expenses, and the fact that his income is not going to substantially increase over the terms of the student loans, Debtor's student loans to HICA and Education are discharged."[23]

## II. DISCUSSION

### A. Standard of Review

■ A district court reviews the bankruptcy court's grant of summary judgment de novo. *Paulman v. Gateway Venture Partners III (In re Filtercorp, Inc.),* 163 F.3d 570, 578 (9th Cir.1998); *Danning v. Miller (In re Bullion Reserve),* 922 F.2d 544, 546 (9th Cir.1991). Viewing the evidence in the light most favorable to the nonmoving party, it must determine whether there exist any genuine issues of material fact, and whether the bankruptcy court correctly applied the substantive law. *Paulman, supra; Grimmett v. Brown,* 75 F.3d 506, 510 (9th Cir.1996).

■ Whether student loans are dischargeable under the undue hardship exception " 'is a question of law subject to de novo review.' " *In re Hornsby,* 144 F.3d 433, 436 (6th Cir.1998) (quoting *In re Cheesman,* 25 F.3d 356, 359 (6th Cir.1994), cert. denied, 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995)); *In re Woodcock,* 45 F.3d 363, 367 (10th Cir.1995); *In re Taylor,* 223 B.R. 747, 750 (9th Cir. BAP 1998).

### B. The Undue Hardship Standard

■ Government-guaranteed student loans cannot be discharged in bankruptcy unless the debt "will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8).[24]

23. E.R. at 601–02.

24. Prior to October 1998, 11 U.S.C. § 523(a)(8) provided that educational loans were not dischargeable unless (A) the loan first became due more than seven years before the date of the filing of the petition (the "seven-year rule"), or (B) excepting the debt from discharge would impose an undue hardship. The Higher Education Amendments of 1998, Pub.L. No. 105–244, § 971, 112 Stat. 1581, 1837 (1998), eliminated § 523(a)(8)'s "seven-year rule" in all cases filed after October 7, 1998, leaving only the undue hardship exception to non-dischargeability. The bankruptcy court in this case did not apply the "seven year rule," and the question on appeal is limited to whether a judgment of discharge for "undue hardship" under former § 523(a)(8)(B) was properly entered on summary judgment.

Wallace contends that a failure to discharge his student loans will subject him to "undue hardship" within the meaning of former 11 U.S.C. § 523(a)(8)(B). Congress did not define "undue hardship" as used in the statute. Courts have noted, however, that "[t]he existence of the adjective 'undue' indicates that Congress viewed garden-variety hardship as [an] insufficient excuse for a discharge of student loans . . . ." *In re Brunner*, 46 B.R. 752, 753 (S.D.N.Y.1985), aff'd., 831 F.2d 395 (2d Cir.1987). Like most other circuits, the Ninth Circuit has adopted the standard for determining undue hardship articulated in *In re Brunner, supra.* See *United Student Aid Funds, Inc. v. Pena (In re Pena),* 155 F.3d 1108, 1111 (9th Cir.1998).

The test is tripartite, and requires that the debtor establish first "that she cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans." *Brunner, supra,* 831 F.2d at 396. This, the *Brunner* court noted, "comports with common sense," and has "been applied frequently as the minimum necessary to establish 'undue hardship.' " *Id.* Second, the debtor must show "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Id.* This second prong puts into effect "the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt." *Id.* The third prong requires "that the debtor ha[ve] made good faith efforts to repay the loans." *Id.* "The 'good-faith' requirement fulfills the purpose behind the adoption of section 523(a)(8)[, which was] a response to a 'rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of education loan

debts.' " *In re Pena, supra,* 155 F.3d at 1111 (citations omitted).

## C. The Summary Judgment Standard

Summary judgment is properly entered when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Proc. 56(c).[25] If the moving party meets this initial burden, the non-moving party must then set forth, by affidavit or otherwise as provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(e). In judging evidence at the summary judgment stage, the trial court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987).

■ A debtor seeking discharge of student loans bears the burden of proving undue hardship by a preponderance of the evidence. *In re Faish,* 72 F.3d 298, 301 (3rd Cir.1995); *In re Raymond,* 169 B.R. 67 (Bankr.W.D.Wash.1994).

## D. Whether Summary Judgment Was Properly Entered In Wallace's Favor

### 1. Wallace's Current Ability To Maintain A Minimal Standard Of Living

■ "The first prong of *Brunner* requires an examination of the debtor's current financial condition to see if payment of the loans would cause his standard of living to fall below that minimally neces-

---

**25.** Rule 56 applies in adversary proceedings in bankruptcy court. Fed.R.Bankr.Proc. 7056.

sary." *In re Roberson,* 999 F.2d 1132, 1135 (7th Cir.1993).

At the hearing on July 28, 1998, the Department asserted that Wallace's purported net monthly income— $1,902.47—actually represented the amount he received every four weeks. Because there are an average of 13.05 four-week pay periods annually, it argued that his monthly net income was actually $2,068.93.[26] Wallace's counsel conceded the accuracy of this figure. Consequently, the court used it to analyze whether Wallace had a present ability to pay the loans. Wallace's average monthly expenses of $1,972.18 consume all but approximately $100 of his quadriweekly paycheck. The Department challenged certain of Wallace's expenses, including $50 per month for the care of his cat, $33 per month for synagogue membership dues, and $385 per month for payments on the 1997 Toyota Tacoma truck. Since only the car payment is sufficiently large to make a difference in Wallace's current ability to service the loans, the parties addressed most of their arguments to the reasonableness of that expenditure.

Wallace presented evidence that he had spent more than $1,200 keeping his Mazda Miata in good repair, and that a mechanic had warned that engine and transmission failures were imminent.[27] In light of this fact, the parties do not dispute the wisdom of Wallace's decision to dispose of the Miata. Rather, they dispute whether his decision to replace the car with a late model Toyota truck was reasonable. Wallace purchased the truck on December 30, 1997, while Education's motion for summary judgment was pending. At purchase, the Toyota had 7,334 miles on the odometer. Wallace received $2,200 trade-in credit for his Miata, which reduced the amount financed to $14,170.77. Adding interest calculated at 19.9%, Wallace obligat-

ed himself to make 59 monthly payments of $385.94 over five years, for a total price of approximately $26,000.[28] This amount included a 100,000 mile service contract that added approximately $1,500 to the total cost.

Given the failing condition of the Miata, had Wallace not bought the Toyota, he would have had to purchase some other means of transportation. The Department argues that it was unreasonable for Wallace not to buy a less expensive vehicle. The bankruptcy court observed that, had Wallace bought a cheaper car, "he would have had higher repair costs."[29] It also noted that Toyota products are renowned for their reliability, and judged Wallace's purchase to have been prudent. The court agrees.

Almost without exception, new cars lose thousands of dollars in value the moment they are driven off the showroom floor. By purchasing a slightly used truck, Wallace avoiding paying a new car premium, yet still obtained a vehicle that could be expected to run reliably for several years to come. Wallace could have bought a less expensive car, but might well have incurred higher repair costs in the long term. Additionally, a less predictably reliable vehicle presented the concomitant risk that Wallace would be stranded, causing him to be late to work, or to incur the cost of renting alternative means of transportation. Wallace was charged a high rate of interest. It is likely, however, that he could not have obtained a more favorable rate from another vendor since he was in bankruptcy at the time. Had he not financed the car purchase, he would have been limited to approximately $2,000 or whatever price he was offered for the Miata. This most likely would have resulted in exchanging one mechanical problem for another. Thus, the court affirms the bankruptcy court's legal conclusion that

**26.** E.R. at 557:8–558:3.

**27.** E.R. at 140.

**28.** E.R. at 306.

**29.** E.R. at 560:18–19.

Wallace would be unable to maintain a minimum standard of living if required to continue paying the loans. This subsumes its conclusion that Wallace's decision to replace his failing Miata with a slightly used Toyota was reasonable.[30] See *In re Rivers*, 213 B.R. 616, 617 (Bankr.S.D.Ga. 1997) (in assessing whether a debtor's student loans were dischargeable, the court found that her purchase of a new 1996 Honda Civic shortly before bankruptcy, resulting in a monthly car payment of $422, was neither extravagant nor excessive because her old car had developed mechanical problems). Cf. *In re Hampton*, 147 B.R. 130, 132 (Bankr.E.D.Ky. 1992) (no substantial abuse warranting dismissal of Chapter 7 petition was indicated despite the fact that the debtors were spending $340 per month for transportation costs when only $150 was reasonable).[31]

### 2. Likelihood That Wallace's Inability To Pay Will Persist For A Significant Portion Of The Repayment Period Of The Loans

 This part of the *Brunner* test considers the likelihood that the debtor's financial situation will improve sufficiently to permit him to resume paying his educational loans. See *Bakkum v. Great Lakes Higher Educ. Corp.*, 139 B.R. 680, 682 (Bankr.N.D.Ohio 1992) (debtor who was 27 years of age, in good health, single, had no dependents, and possessed Bachelors and Masters degrees was held to have good prospects for an improved financial situation); *In re Connor*, 83 B.R. 440, 446 (Bankr.E.D.Mich.1988) (refusing to hold that the payment of loans would constitute an undue hardship despite the debtor's current inability to find employment, because she was a "healthy, intelligent, articulate, well-educated individual," and "where there is a will, there is a way"). "Requiring evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time, more reliably guarantees that the hardship presented is 'undue.'" *Brunner, supra*, 831 F.2d at 396. See also *In re Barrows*, 182 B.R. 640, 649 (Bankr.D.N.H.1994) ("In general, to determine dischargeability of student loans, the Court is most concerned with the future employability of the debtor").

 Wallace's student loans had a 30 year term, which commenced in 1995. As

30. The parties agree that the underlying facts concerning Wallace's income and expenses, and the cost of the truck, are undisputed. Undue hardship is a question of law, and the bankruptcy court's conclusion that Wallace's purchase of the truck was reasonable was integral to its conclusion that he could not currently afford to continue his loan payments. Thus, in this context, the reasonableness of the purchase is a question of law reviewed de novo. See *In re Simons*, 119 B.R. 589, 591 (Bankr.S.D.Ohio 1990) ("At the outset the Court notes that the facts are uncontroverted, thus the issues presented are capable of resolution as a matter of law pursuant to Bankruptcy Rule 7056 pertaining to summary judgment"). See also *In re Rice*, 78 F.3d 1144, 1148, n. 5 (6th Cir.1996) (holding that the issue of unconscionability under the seven year rule of former § 523(a)(8)(A) was a legal question where "many of the relevant facts (particularly those pertaining to the debtor's employment and income) are stipulated, [and] no questions of fact remain which prevent entry of summary judgment").

31. But see *Perkins v. Vermont Student Assistance Corp.*, 11 B.R. 160, 161 (Bankr.D.Vt. 1980) (refusing to discharge student loans since the debtor's purchase of a new car was a "self[-]imposed hardship"); *In re Reyes*, 106 B.R. 155, 158 (Bankr.N.D.Ill.1989) (in determining the debtor's disposable income for purposes of confirming a Chapter 13 plan, the court held that monthly payments of $472 for a one-year-old Chevrolet Blazer were not reasonably necessary for the debtor's support, but were an "obvious overindulgence," since he could have bought another new car for half the price of the Blazer or a reliable used car for substantially less); *In re McCormack*, 159 B.R. 491, 494 (Bankr.N.D.Ohio 1993) (dismissal of a Chapter 7 petition for substantial abuse was warranted where the debtors, after filing their bankruptcy petition, entered into a 48 month lease on a new car at a cost of $400 per month).

respects his future income, the bankruptcy court had before it an LAUSD schedule that reflected a range of teacher salaries based on education and experience. Interpreting this schedule at the July 28, 1998 hearing, the Department asserted that, since Wallace has a doctorate, he would not plateau until he reached an annual salary of $56,875.[32] The bankruptcy court estimated that Wallace would earn $41,000 annually after ten years, about $45,000 after 20 years, and approximately $48,000 after 25 years. It noted:

"THE COURT: It does appear that his income after 25 years will get up close to 50,000, if we're reading the chart correctly. Would that be the right way to read it, Mr. Glowa?"

"MR. GLOWA: Your Honor, I don't understand all of this chart.... I can see that next year he's going to get 2,419, and the year after that 2,515.... I'd have to ask Mr. Wallace how this works out."

At the October 27 hearing, the Department again argued that Wallace's expenses were not constant, and that his salary would not remain static at $31,000.[33] It also argued that Wallace could, like many experienced teachers, work as a substitute during some part of his annual four months' vacation in order to supplement his income.[34] Additionally, it noted that Wallace could have, and still may, elect an "income contingent" repayment plan that will adjust his payments according to his ability to pay, terminate at the end of 25 years, and forgive any outstanding balance at that point. Wallace applied for such a plan, but did not elect it because he believed he could not afford to make the $369 per month payments calculated by the Department.[35]

The bankruptcy court made no specific finding concerning Wallace's probable future income or concerning the effect of the "income contingent" payment program on his future ability to repay the loans. It concluded, however, that given "what [Wallace's] likely prospective [income] will be, its my judgment that continuation to owe these sums will impose an undue hardship on him."[36] The court's written findings of fact and conclusions of law similarly include no finding regarding Wallace's likely future income or ability to pay. They do, however, reflect the court's legal conclusion that

"[b]ased on Plaintiff's current monthly income and living expenses, and *the fact that his income is not going to substantially increase over the terms of the student loans,* Debtor's student loans to HICA and Education are discharged."[37]

Based on the record before it, the court concludes that factual issues may exist respecting the proper interpretation to be given to the LAUSD salary schedule and whether Wallace is eligible for higher compensation based on his law degree. In order to permit the introduction of evidence on these subjects, and to address the evidence adduced regarding the impact of the "income contingent" program on Wallace's future ability to pay, the court remands the matter to the bankruptcy court to develop the record further, and

32. E.R. at 570; E.R. at 309.

33. E.R. at 595–96.

34. The Department asserted additionally that Wallace would be able to begin making substantial payments on the loans after he had completed his payments on the Toyota in the fall of 2002. The bankruptcy court's view of this argument appears to have been that the life-expectancy of the Toyota might not exceed five years, that Wallace might need to replace the truck shortly after he completed payments on it, and thus that a reduction in Wallace's expenses is not certain. (See E.R. at 572:10–18 ("THE COURT: Well, that may not last more than five years, sir")).

35. See Appellee's Brief at 23; E.R. at 39, n. 13 (describing the "income contingent" plan in detail). The Department notes that Wallace somewhat inconsistently determined that he could afford $385 monthly car payments.

36. E.R. at 599.

37. E.R. at 601–02 (emphasis added).

make appropriate factual findings assuming the evidence is undisputed. See *In re Rose*, 227 B.R. 518, 525 (W.D.Mo.1998) ("The Court also believes that [the debtor's] future earning potential deserves closer scrutiny.... [E]arnings are typically lower at the beginning of a career than in the middle or at the end.... [I]n demonstrating that [the debtor's] earning power is not likely to improve (a burden that falls on the Debtors because they must prove undue hardship), the Debtors must present something that proves their point-which they have not done.... As a general matter, the debtor should present some sort of data demonstrating the average or expected earning potential of people in his or her occupation").

### 3. Debtor's Good Faith Efforts To Repay His Loans

 "With the receipt of a government-guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses." *In re Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993) (citation omitted). Under the standard articulated in *Brunner*, a debtor must make an effort to repay the loans or show "that the forces preventing repayment are truly beyond his or her reasonable control." *Brunner, supra*, 46 B.R. at 755; see also *Lebovits v. Chase Manhattan Bank (In re Lebovits)*, 223 B.R. 265, 274 (Bankr.E.D.N.Y.1998) (since "a debtor's good faith is interpreted in light of his ability to pay, a complete failure to make even minimal payments on a student loan does not prevent a finding of good faith where the debtor never had the resources to make payments"). While not employing the term "good faith," the bankruptcy court found that Wallace "made payments on the HICA and Education loans as long as he could." [38]

The facts on which the bankruptcy court appears to have based this decision are not in dispute. Wallace paid his loans for several years while working as an attorney for Wausau. When he was unable to pay, he sought and received deferments. Additionally, he alleges—and the Department does not contest—that he made a $8,000 lump sum payment when he was able to do so. These actions evidence Wallace's earlier good faith efforts to pay the loans.

Education contends, however, that Wallace's more recent conduct evidences a lack of good faith. It complains that Wallace obligated himself to make monthly car payments of $385 only two weeks after he filed a sworn declaration stating that he had virtually no discretionary income and thus no ability to pay his educational loans. It contends that Wallace's choice not to supplement his income by working during his annual four months' vacation demonstrates a continuing lack of good faith.

 The bankruptcy court's finding that Wallace made payments "as long as he could" was in reality a legal conclusion that he attempted in good faith to make payments on the loans prior to initiating this adversary proceeding. The court earlier noted its agreement with the bankruptcy court's conclusion that purchase of the Toyota truck was reasonable given the circumstances with which Wallace· was faced. Thus, it cannot conclude that buying the truck evidences a lack of good faith efforts to repay the loans. Nor can the court say that declining to work during periods of annual leave reflects a lack of good faith, given Wallace's history of mental problems exacerbated by stress, and his principal's advice that he use the time to rest and prepare for the upcoming year. Finally, given Wallace's history of making loan payments, his requests for deferment, and his lump sum payment, his failure to elect the "income contingent" plan in December 1997, while on the verge of bankruptcy, does not signal a lack of good faith in attempting to repay the loans. The Department contends, however, that Wallace's conduct during the pendency of the

---

**38.** E.R. at 602.

bankruptcy proceeding evidence a lack of continuing good faith. It asserts that Wallace's failure to explore the "income contingent" plan further, and/or to apply for an "alternate plan" after he was advised of that option, demonstrate that he has not attempted in good faith to repay the loans. A debtor's good faith can be measured by evaluating how he responded to repayment opportunities that were presented to him. One court has described the "good faith" prong of *Brunner* as:

> "a moving target that must be tested in light of the particular circumstances of the party under review.... [T]he characterization of that effort must reflect not only a party's objective conduct, but also the environment in which that conduct occurs. In those instances in which the debtor cannot maintain a minimal standard of living even without payment of student loans, the demonstration of good faith does not necessarily command a history of payment. It does require a history of effort to achieve repayment, such as when a borrower diligently uses a deferment period to attempt the reorganization of her financial affairs." *In re Maulin*, 190 B.R. 153, 156 (Bankr. W.D.N.Y.1995).

See also *In re Thomsen*, 234 B.R. 506, 510–12 (Bankr.D.Mont.1999) (quoting *Maulin*).

Under the "income contingent" plan, the borrower's repayment amount is recalculated annually based on changes in his adjusted gross income, the variable interest rate, and certain other factors and guidelines. See 34 C.F.R. § 685.209(a)(5). Wallace's initial review of the literature describing the repayment plans may have led him to believe that his monthly payments would be $390, separate and apart from any amount due on the Hemar loan. Because he could not afford payments of

such magnitude, he reasonably did not pursue the "income contingent" plan.

Wallace was later informed by Education's counsel that his payments could be as low as $369 per month. He asserts he did not elect to participate at this point because he has "less than $100.00 disposable income per month, [and] even under the income contingent repayment plan, [his] standard of living would [have] fall[en] well below the minimally necessary standard if forced to pay $369.00 per month." [39] Indeed, prior to the December 23, 1997 hearing, Wallace advised Education of this fact.

At the December hearing, however, Education represented that Wallace had the further option of applying under a "special circumstances" regulation. While the court continued the hearing in part to allow Wallace to explore and/or apply for, such a repayment plan, there is no evidence he ever did.

At the March 31, 1998 hearing, Education made a further concession. Counsel informed the bankruptcy court that the Department was willing to permit Wallace to repay his loan under the "income contingent" plan in such a fashion that the $369 per month would be apportioned between it and Hemar. He indicated that the Department did not know that Hemar would accept such a plan, but that "Education was willing to enter into such an agreement." [40] There is no evidence that Wallace inquired whether Hemar would agree to such a plan, or that he attempted any further negotiations with either creditor.

On April 14, 1998, Wallace was deposed.[41] The Department's counsel asked Wallace: "Assuming you were eligible and were provided a procedure for such an application today, are you interested in applying for an alternate repayment plan?" Wallace responded:

---

**39.** *Id.* at 11.

**40.** E.R. at 188.

**41.** Education attached excerpts of the deposition transcript to its opposition to Wallace's summary judgment motion.

"Well, I would have to consult with my attorney. I think I'd have a problem with that because, (A) I don't think I have enough extra money in my budget to pay right now. And, (B), even if I were to, I'd still have the problem of Hemar vying for the same amount of money, Hemar qualifying as a federal loan and Hemar would have equal dibs on the amount that I would theoretically, hypothetically be asked to pay. So I'm still in the same problem I've been in throughout the entire case." [42]

It is unclear whether Wallace ever attempted to negotiate coordinated payments with Education and Hemar. Nor does anything in the record suggest that he ever applied for, or inquired about, the "alternate" plan that the Department's lawyer described several times at the motions hearings.

 The "good faith" test encompasses the notion that a "debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *In re Roberson, supra,* 999 F.2d at 1136. "Factors to be considered include the number of payments [the d]ebtor made, attempt to negotiate with the lender, proportion of loans to total debt, and possible abuse of the bankruptcy process." *In re Windland,* 201 B.R. 178, 183–84 (Bankr.N.D.Ohio 1996). A number of cases, including *Brunner* itself, have concluded that a debtor's effort—or lack thereof—to negotiate a repayment plan is an important indicator of good faith. See *Brunner, supra,* 831 F.2d at 397 (finding that the debtor lacked good faith in attempting to discharge debt because she had failed to seek a deferment on her loan); *McLeod v. Diversified Collection Services (In re McLeod),* 176 B.R. 455, 458 (Bankr.N.D.Ohio 1994) (finding a lack of good faith where the debtor failed to negotiate payments before seeking discharge); *Matter of Sands,* 166 B.R. 299, 311 (Bankr. W.D.Mich.1994) ("In determining the

Debtor's good faith, the court must not only examine the Debtor's payments towards his student loans, but also his efforts to negotiate deferments with the applicable student loan agency."). See also *In re Healey,* 161 B.R. 389, 397 (E.D.Mich. 1993) (finding the debtor's attempt to discharge debt without first seeking to negotiate a payment arrangement with the lender evinced bad faith); *In re Phillips,* 161 B.R. 945, 948 (Bankr.N.D.Ohio 1993) (debtor's failure to seek the less drastic remedy of deferment of payments before attempting to discharge the loan, and failure to negotiate payment arrangements with the lender, evidenced a lack of good faith); but see *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman),* 25 F.3d 356, 360 (6th Cir.1994) (holding there was no evidence that debtors did not act in good faith despite fact that there was no evidence that they sought the less drastic remedy of a deferment before attempting to discharge their debts).

 The evidence adduced by Education regarding Wallace's lack of diligence in pursuing repayment options, despite its repeated overtures, militates strongly against a finding that Wallace continued his good faith efforts to repay the loans. A debtor's obligation to make "good faith" efforts to repay his educational loans is not extinguished with the filing of an adversary proceeding in bankruptcy. Yet, it appears that at or about the time of the December 1997 hearing, Wallace ceased all efforts to negotiate a workable repayment plan with the Department and/or Hemar, despite its repeated invitation that he do so.

So far as it considered the question of good faith, the bankruptcy court's conclusions were correct—that Wallace "paid his loans as long as he could." The court did not, however, consider whether Wallace ever attempted to negotiate a lower repayment option with Education or Hemar,

**42.** E.R. at 539:21–540:5.

despite numerous discussions in open court about the options available to him in this regard. From the evidence in the record, it appears that Wallace ceased good faith efforts to repay loans when he elected not to apply for, or inquire about, the "alternate" repayment plan first referenced by the Department's attorney at the March 31, 1998 hearing and several times thereafter. In order that the bankruptcy court may further develop the record and consider whether Wallace's good faith efforts to repay the loans continued up to and including the time of the summary judgment order discharging the debt, the court reverses and remands for further factual findings on this issue.[43]

## III. CONCLUSION

For the foregoing reasons, the court reverses the bankruptcy court's entry of summary judgment in Wallace's favor. It remands for (1) further record development and factual findings, if appropriate, and/or for the identification of factual issues precluding summary judgment, respecting Wallace's likely future income and ability to pay, and (2) further record development and further factual findings as to whether he exhibited the requisite good faith in considering alternate payment plans other than the income contingent plan.

---

43. The court notes that neither of the cases the Department cites regarding the availability of flexible repayment programs addresses the issue in the context of the debtor's good faith efforts to repay the loans. Rather, each considers the issue in assessing the debtor's future ability to pay. See *In re Ipsen*, 149 B.R. 583, 586 (Bankr.W.D.Mo.1992); *In re Warren*, 6 B.R. 233, 234 (Bankr.S.D.Fla. 1980).